**UNITED STATES ex rel. Louie PON, Relator,**

v.

**P. A. ESPERDY, District Director for the New York District, Immigration and Naturalization Service, United States Department of Justice, Respondent.**

No. 68 Civ. 1460.

United States District Court
S. D. New York.

Feb. 25, 1969.

Julius L. Bezozo, New York City, for relator.

Robert M. Morgenthau, U. S. Atty., for respondent; Francis J. Lyons, Special Asst. U. S. Atty., of counsel.

WYATT, District Judge.

This is a petition by an alien, Louie Pon, for a writ of habeas corpus. The petitioner was in custody pursuant to an order of deportation and sought to "obtain judicial review thereof". 8 U.S.C. § 1105a(a) (9). The writ was allowed on April 10, 1968, and duly issued that day. By order filed on the following day, Pon was ordered released from custody by Judge Tyler under $1500 bond pending determination of this petition. That petitioner is no longer in physical custody but under a bail bond does not affect the jurisdiction of this Court to decide his petition. Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

For the reasons given hereafter, the relief sought by the petition will be granted and the petitioner ordered to be discharged from the custody of respondent.

The surname of petitioner is Louie and his given name is Pon. He will be

referred to hereafter in short as "Pon". Apparently Chinese in this country sometimes put the surname first, sometimes last.

Pon is a citizen of China who entered the United States at San Francisco under a false name on September 9 or 10, 1948, and who falsely represented himself to be a *citizen* of the United States. *Aliens* arriving at the United States are subject to inspection by immigration officers to determine whether they belong to excluded classes (8 U.S.C. §§ 1222–1225). By falsely representing himself as a citizen, Pon entered "without inspection" and was thus subject to deportation under 8 U.S.C. § 1251(a) (2). Ben Huie v. I & N Service, 349 F.2d 1014, 1017 (9th Cir. 1965).

Pon was born in 1920 in Soon Wah village, Kwangtung Province, China. Canton is the capital of Kwangtung Province. Soon Wah must not be far from Canton but Pon speaks a "Toyshan" dialect rather than the Cantonese; possibly "Toyshan" is what appears on the map (Rand McNally International World Atlas, p. 34) as "Taohsien".

The father and mother of Pon were born in China but the father had lived in the United States for some years before returning to China. Pon had two older brothers (Thomas and Lee) and two sisters (one of the sisters went to Indonesia and the other remained in China; they do not seem to figure in the relevant history).

Pon was married in his native village in 1936 and had three children, the oldest and youngest being girls and the middle child a boy.

Thomas Louie, an older brother of Pon, came to the United States in 1928. He went to school in New York City and for many years has had a laundry here; for some time he has lived in Far Rockaway with his wife and three children, born in New York. He went back to China in 1933, married his wife there in 1933 and returned to New York in 1937; his wife joined him here in 1948. Thomas served in the United States Air Force in the period 1942–45.

Louie Lee, the other older brother of Pon, also came to the United States. Not much is in the record about Lee but it appears that he has lived in Far Rockaway for a number of years, has his own laundry there, and served in the Armed Forces of the United States.

Pon's father died in China about 1945.

As already noted, Pon came to the United States in September 1948. He came to New York City in December 1948, has lived here ever since, and for at least the last 15 years has lived at the same address, 156 West 143rd Street, where he has had a laundry. He has not left the United States since his arrival here.

In 1950 Pon registered for military service with his Selective Service Local Board; at first classified 1–A, about a month later he was classified 4–F.

About 1958 Pon's mother, wife and his two younger children left China and went to Hong Kong. Apparently Pon supports his wife and two children from his earnings here; he and his two brothers, or some combination, support the mother. Pon's oldest daughter is married and lives in Canton in China; her husband lives in Hong Kong.

In January 1962, Pon and his two brothers confessed their illegal entry into the United States to the Immigration and Naturalization Service (the Service); they admitted that they were subject to deportation. Their objective was evidently to secure an adjustment of their status to that of aliens "lawfully admitted for permanent residence", as provided in 8 U.S.C. § 1254(a). Their confessions were doubtless brought about by the "Chinese Confession Program" of the Service. See (1962) 2 U.S. Cong. and Adm.News 4026, 4027.

The two older brothers, Thomas and Lee, have accomplished their objective, obtained an adjustment of their status, and for some time have been citizens (by naturalization) of the United States.

Pon has failed to accomplish his objective because of the finding of the Service that his "attitude toward the

bearing of arms, and toward the Communist government of China raised a question as to his loyalty and attachment to our Government" (opinion (hereafter "op.") of Board of Immigration Appeals of June 30, 1965).

Deportation proceedings as to Pon were commenced by order to show cause dated December 17, 1963.

At the first hearing (January 15, 1964) before a Special Inquiry Officer (for short, the Officer), Pon admitted that he was subject to deportation. On the same day he executed an application under 8 U.S.C. § 1254(a) (1) for suspension of deportation, which if granted would permit adjustment in status to that of an alien lawfully admitted for permanent residence.

An alien is eligible for discretionary suspension of deportation under the section cited, only if (a) he has been in this country continuously for at least seven years, (b) he has been at all times while in this country of good moral character, and (c) his deportation would result in extreme hardship.

There was an investigation of Pon by the Service; there were hearings before the Officer on January 16, and July 20, 1964 and January 20, 1965. The only witness was Pon himself, who spoke in the Toyshan dialect. It may be noted that there was a different interpreter each time Pon testified; whether these spoke the Toyshan dialect does not appear.

The Officer made his decision on February 5, 1965, denying suspension of deportation "as a matter of administrative discretion" (See 8 CFR 244.1) and making an order of deportation. A careful opinion was filed, giving the reasons for the decision. It was found that Pon was eligible for discretionary suspension because he had been in this country for about 17 years, had been of good moral character, and would suffer extreme hardship if deported (because he could not make a living elsewhere, indeed had no place to go, and could not return here). Suspension was refused because

of Pon's "state of mind" (op. p. 7), especially about "his bearing of arms" (op. p. 10) and about the Communist government of mainland China.

On appeal, the Board of Immigration Appeals by decision on June 30, 1965 dismissed the appeal, with a careful statement of reasons for the decision. The principal basis for decision was that the record raised "a doubt as to respondent's loyalty to the United States" (op. p. 3). No petition for review was filed with a Court of Appeals within the time fixed by law. 8 U.S.C. § 1105a (a) (1).

In December 1965, Pon's mother, then about 88 years old, arrived in the United States from Hong Kong. She has been a lawful resident of the United States since then.

On September 28, 1966, Pon was notified to surrender for deportation on October 10, 1966.

On October 5, 1966, Pon moved to reopen the deportation proceeding, to vacate the deportation order, and to stay deportation. Pon's mother submitted an affidavit, in effect condemning the present regime in China, recounting her mistreatment in her native village, and expressing her belief that Pon was loyal to this country. Pon himself made affidavit that he had always been willing to "fight for the United States against any enemy including China".

On October 7, 1966, the District Director denied a stay of deportation and ordered surrender on October 10, 1966. The first reason given was that no new evidence of loyalty had been presented "other than self-serving declarations". It would seem, however, that the mother's affidavit, with its story of her misadventures in China and the effect on Pon, was new evidence. The second reason given was that Pon had waited about ten months after his mother's arrival here before moving to reopen. It appears, however, that Pon was free on bail during this period and, as noted above, it was not until September 28,

1966, that an order to surrender was directed to him.

On October 7, 1966, Pon filed a petition for judicial review with the Court of Appeals for this Circuit.

On October 10, 1966, Pon surrendered himself for deportation. The Service directed his detention without bail.

Pon applied to the Court of Appeals for release on bail during the pendency of the judicial review proceedings. On October 17, 1966, the Court of Appeals ordered Pon's release in $5000 bail; Pon posted bail and was released.

On October 24, 1966, the Board of Immigration Appeals denied the motion to reopen the deportation proceedings.

On January 15, 1968, the Service gave notice of a motion returnable January 22 before the Court of Appeals for an order dismissing Pon's petition for review because there was no jurisdiction and because the petition was moot. It was urged that there was no jurisdiction since the petition for review of the order of deportation had been filed long after the time fixed by law. It was urged that the petition to review an order of the District Director denying a stay of deportation was moot because thereafter the Board of Immigration Appeals had denied the motion.

On January 22, 1968, the Court of Appeals (Medina, Moore, Anderson, C. JJ.) from the Bench dismissed the petition for review "for lack of jurisdiction and for mootness".

On April 3, 1968, Pon was notified to surrender for deportation on April 10, 1968. He did surrender on that day and the present petition for a writ of habeas corpus was then filed. Pon has been free under the bail fixed by Judge Tyler.

■ It seems clear that since Pon is "held in custody pursuant to an order of deportation" he may "obtain judicial review" of that order "by habeas corpus proceedings". 8 U.S.C. § 1105a(a) (9). It is true that Congress, in enacting the relevant statute (8 U.S.C. § 1105a), did seek to correct a condition "whereby persons subject to deportation were fore-

stalling departure by dilatory tactics in the courts". Foti v. I and N Service, 375 U.S. 217, 224, 84 S.Ct. 306, 311, 11 L.Ed.2d 281 (1963). But when the statute specifies that judicial review of an order of deportation in the Court of Appeals is "the sole and exclusive procedure", this refers to "procedure" *before* the alien is in custody. The legislative history is clear in this respect. (1961) 2 U.S.Code Cong. and Adm.News, pp. 2968, 2973. The statute specifically saves habeas corpus to the alien in custody (8 U.S.C. § 1105a(a) (9)) and avoids duplicating reviews by providing that habeas corpus may not be entertained (with some exceptions) "if the validity of the order has been previously determined" (8 U.S.C. § 1105a(c)).

The order denying, as a matter of discretion, a suspension of the deportation of Pon is subject to judicial review in the manner provided in 8 U.S.C. § 1105a because included within the phrase "final orders of deportation" therein. This was the point set at rest by Foti v. I and N Service, cited above.

The Attorney General has delegated his authority under the Act to the Commissioner of the Service, including the exercise of discretion under 8 U.S.C. § 1254(a). See 8 CFR 2.1. The Commissioner has issued regulations, by which authority to exercise discretion under 8 U.S.C. § 1254(a) is vested in Special Inquiry Officers (8 CFR 242.8), subject to appeal to the Board of Immigration Appeals (8 CFR 3.1(b) (2), 242.21).

No factors to guide the discretion to suspend deportation have been announced, by regulations or otherwise. Judge Friendly referred to this lack in Wong Wing Hang v. I and N Service, 360 F.2d 715, 718 (2d Cir. 1966).

It is undisputed that Pon is eligible for a discretionary suspension of deportation under 8 U.S.C. § 1254(a) (1). He has been in this country continuously, now for over 20 years; his deportation would cause extreme hardship; and at all times in this country he has been "of good moral character". So the Service specifically found.

In the case at bar, the Officer based denial of suspension of deportation on a finding that Pon's "state of mind and attitude was not one which merits the relief he has requested as a matter of administrative discretion" (op. 10). These words are broad and general but may fairly be said to refer to an underlying finding that Pon has no "feeling of obligation and loyalty to the needs of the United States" (op. 10).

The underlying finding—that Pon has no "feeling of obligation and loyalty to the needs of the United States"—is not "supported by reasonable, substantial, and probative evidence on the record considered as a whole" (8 U.S.C. § 1105a (a) (4)). The denial of suspension of the deportation of Pon is therefore not in accordance with the law.

The Officer relied on evidence that Pon had been for some years until 1962 a member of the Chinese Hand Laundry Alliance (Alliance). When he confessed to the Service in 1962, Pon was told by the Service that the Alliance was "a suspect organization" (op. 3); according to Pon, he was told, when he confessed, that the Alliance was "all communist". Pon promptly and unequivocally terminated his membership in the Alliance; this is undisputed and suggests a feeling of obligation and of loyalty, at least to the views of the Service.

As the Officer noted in his opinion (p. 3), there was no evidence for the Service as to what the Alliance was. Apparently the Service had some feeling that it was Communist in sympathy and that it supported the Chinese Communist regime; aside from a showing of some financial help to the China Daily News by some members of the Alliance, there is nothing in the record from which the character of the Alliance can be learned. Pon's membership in the Alliance, therefore, could not properly be a factor in the exercise of the discretion invoked. But even if the Alliance be assumed to be wholly Communist (cf. 8 U.S.C. § 1251(a) (6) (C)), Pon's membership was not shown to have been "a meaningful association" in this context. Rowoldt

v. Perfetto, 355 U.S. 115, 120, 78 S.Ct. 180, 2 L.Ed.2d 140 (1957). See also Gastelum-Quinones v. Kennedy, 374 U.S. 469, 83 S.Ct. 1819, 10 L.Ed.2d 1013 (1963). Pon testified, without any contradiction, that he had never been a member of, or given any support to, the Communist party; that he took no part in politics at the Alliance; that he did not know who in the Alliance were pro-Communist; and that he joined the Alliance "to seek their assistance in connection with my laundry work" (Tr. 46). There was no basis from his membership in the Alliance for supposing that Pon was not loyal to this country and its principles. With specific reference to "loyalty" as affected by membership in an organization, the Supreme Court has used words which seem applicable to the case of Pon: " * * * membership may be innocent. * * * In recent years, many completely loyal persons have severed organizational ties after learning for the first time of the character of groups to which they had belonged". Wieman v. Updegraff, 344 U.S. 183, 190, 73 S.Ct. 215, 218, 97 L. Ed. 216 (1952).

Another factor which seems to have influenced the Officer against Pon was that he made contributions of money to the China Daily News and received the newspaper for a number of years, ending in 1962. Apparently the China Daily News was published in the Chinese language in New York. Pon contributed $20 a year for 3 or 4 years, ending in 1957. He was asked to contribute by some one at the Alliance or at a club next door where Pon played mahjong. The China Daily News was being sent to Pon's laundry at the time Pon bought the laundry. Evidently there was a good deal of support for the China Daily News in the Alliance, explained by the fact that when the Alliance was at one stage competing with a rival organization, the China Daily News helped and favored the Alliance. The Officer concluded that the China Daily News "followed a consistent long-time policy of favoring the communist position in general and

the interests of the People's Government in China in particular; as well as a consistent anti-American policy. * * *" (op. 6).

The basis for the Officer's conclusion as to the China Daily News was translations into English of excerpts from the newspaper made by the attorney for the Service. These translations were marked Exhibit 8 (Tr. 43). They do not appear in the record submitted to the Court and a search by the Service has failed to turn them up. For present purposes, it will be assumed that the conclusion of the Officer was a correct one. The Officer felt it "unlikely" that Pon would read the China Daily News over a period of about nine years unless he substantially agreed with its news and editorial policies (op. 7). The Officer was unwilling on the basis of this reading alone to find Pon's "state of mind" but considered this reading as "merely one small item of evidence" (op. 7). I cannot agree with the Officer that this is *any* evidence of Pon's "state of mind". There is no logical connection between the two things. It would be just as logical to find that Pon was anti-Communist and read the China Daily News to find out what the opposition was doing. For this reason, indeed, it may be supposed that many persons in this country, in and out of government, are reading Pravda, Peking newspapers, the Daily Worker, and all other available Communist newspapers—including the China Daily News (if it is still published). It may be remembered in this connection that "communist political propaganda" from abroad was the subject of Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). Pon himself gave a perfectly understandable, and innocent reason, for reading the China Daily News. He said that while he was not in favor of the mainland Chinese government he read the China Daily News because he was "interested in knowing the conditions in China", "what happened in China" (Ex. 5, p. 9).

The final and principal reason for the denial of suspension of deportation was the attitude of Pon toward bearing arms for the United States. There is no specific finding of what this attitude is. There is no finding that Pon refused to bear arms for the United States and no evidence to support such a finding if it had been made.

The only evidence on the subject is replies of Pon to questions. Some of his answers are seemingly inconsistent. Whether this derives from translation difficulties is not certain. At one point he said that he "would not join the army" if the United States was in a war with China (Tr. 51). This must have meant that he would not volunteer because shortly afterwards he said that if "the government wants me to join the army I will go" (Tr. 55). He made it clear that he would be "reluctant" to fight against China, but if asked by the United States would do so (Tr. 56).

Pon testified that he would fight for the United States if required (Tr. 6, 46). He testified that he would be willing to bear arms for the United States even "if Communist China were involved" (Tr. 49). At another point, Pon said that, in a war between China and the United States he would not help either side because he did not like war (Ex. 5, p. 9). He then said, however, that he did not mean that he would refuse to bear arms against China; he said that he would "comply with any law that the United States has" (Ex. 5, p. 9).

The only conclusion properly to be drawn from the statements of Pon is that he would be reluctant to bear arms against the Chinese, communists or not, but that if required by the United States he would do so. There is no reason whatever to conclude from such reluctance that Pon is in any way disloyal to the United States. Being Chinese, born there and with some family members still there, his attitude seems normal, natural, and entirely consistent with loyalty to the United States.

Indeed, if Pon had flatly refused to bear arms against China—which he did not—this would not be proof of disloyalty.

A precedent in point is the decision of the Board of Immigration Appeals in Matter of C_____, 2 I and N Dec. 895 (1947). The alien, an Italian, had twice refused to serve in the armed forces of the United States. The Board stated (at 896):

"With respect to respondent's refusal to serve in the armed forces the record establishes that his refusal was based to a large extent on his unwillingness to serve against the country of his nationality. We do not think that respondent's objection to service in the armed forces was an unnatural reaction on his part. While it perhaps indicates that he was not a person of very strong convictions, it certainly does not, in our opinion, prove his lack of loyalty to this country."

While the Attorney General at first reversed the Board's decision and referred to this particular point, the Attorney General then changed his mind and approved the Board's decision (2 I and N Dec. at 898). The Officer noted that the alien in the cited case had a family in this country, a factor to which the Board referred in its opinion. This does not in any way affect the *principle*, namely, that disloyalty is not found from refusal to serve in the army against the country of the alien's birth. The same principle is illustrated in Matter of R_____, 3 I and N Dec. 532 (1949).

An even more authoritative precedent is found in Krausse v. United States, 194 F.2d 440 (2d Cir. 1952). One question there was whether an alien was "attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States". 8 U.S.C. § 1427(a). It appeared that the alien, a Hungarian, had on three occasions in 1942 and 1943 objected to serving in the armed forces of the United States. On the first two occasions, in 1942, his reason was that "he might have to fight members of his own family" (194 F.2d at 443). This was termed "an adequate excuse" by our Court of Appeals (194 F.2d at 443). Before his third refusal in 1943, the policy of the Selective Service System or of the armed forces was changed so that an alien, if sent to a combat area, would be assigned to an area "where he will not normally be required to fight against fellow nationals or blood relatives" (194 F.2d at 443). The alien continued to refuse to bear arms, on the claimed ground that, as an alien, he would not be eligible for treatment as a prisoner of war if captured. The district judge ruled that "refusal to bear arms is not of itself a sufficient ground for denial of the petition" for naturalization (194 F.2d at 443–444) but denied the petition nonetheless. The Court of Appeals reversed and ordered that the alien be admitted to citizenship. See also In re Naturalization of Denessy, 200 F.Supp. 354 (D.Del.1961) which looks the same way and In re Krause's Petition, 159 F.Supp. 687 (S.D.Ala.1958) which looks the other way.

■ I conclude that a refusal to bear arms against the country of birth does not necessarily indicate disloyalty to the United States. In this case, Pon explained that he was reluctant "to fight any group of Chinese people" (Tr. 51), that he is "a Chinese person" and would not like "to fight with my own people" (Tr. 50), that he "was brought up in China" (Tr. 53). His feeling was not due to loyalty to the Chinese Communist regime rather than to the United States. He said that he favored no particular government in China (Tr. 6), that "the Chinese people do not care who controls the government" (Tr. 54) and that he was not "in favor of" the Chinese Communist regime (Ex. 5, p. 9). He said several times that he was loyal to the United States (for example, Tr. 6) and that he would in fact bear arms for the United States against China (for example, Tr. 55, 56).

■ There is no basis in the record for any finding of disloyalty on the part of Pon.

The grounds stated for denying suspension of deportation are insufficient on their face. The petition must be granted, therefore, and the writ sustained. The petitioner is directed to be released from custody. The effectiveness of this order is stayed until March 5, 1969 so that respondent may consider an appeal and an application to the Court of Appeals for any further stay deemed appropriate.

So ordered.