356 F.Supp. 571 (1973)
HON KEUNG KUNG, Petitioner,
v.
DISTRICT DIRECTOR, IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
No. 72 C 770(3).
United States District Court, E. D. Missouri, E. D.
February 28, 1973.
*572 Courtney Shands, Jr., St. Louis, Mo., for petitioner.
Daniel Bartlett, Jr., U. S. Atty., John A. Newton, Asst. U. S. Atty., St. Louis, Mo., for respondent.

MEMORANDUM AND ORDER
WEBSTER, District Judge.
This matter is before the court on a petition for a writ of habeas corpus to review a final order of deportation entered pursuant to 8 U.S.C. § 1251(a)(2). See 8 U.S.C. § 1252(b).
Title 8, U.S.C. § 1105a(a)(9) provides:
"any alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings."
Petitioner is "in custody" under a bond conditioned on his delivery to the custody of the District Director of the Immigration and Naturalization Service in St. Louis, Missouri. United States v. Esperdy, 296 F.Supp. 726 (S.D.N.Y. 1969); Varga v. Rosenberg, 237 F.Supp. 282, 285 (S.D.Calif.1964). Cf. Jones v. *573 Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963); Brownell v. Tom We Shung, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956); Pizarro v. District Director, United States Immigration & Naturalization Service, 415 F.2d 481 n. 1 (9th Cir. 1969).
The standard of review to be applied here is as follows:
". . . The petition shall be determined solely upon the administrative record upon which the deportation order is based and the Attorney General's findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive;" 8 U.S.C. § 1105a(a)(4).
The facts, as found by the Board of Immigration Appeals ("the Board"), are substantially as follows: On January 14, 1969, two Immigration and Naturalization Service (I & N S) officers went to the MacArthur Hotel in St. Louis, Missouri, to speak to one Sandy Lee. The officers believed that Lee could furnish them with information concerning the whereabouts of two deserting Chinese crewmen named Wang and Chang. The officers approached Lee's room (# 1407) and found the door ajar approximately three or four inches. One of the officers knocked on the door and Lee opened it wide. The officer identified himself and informed Lee of his mission. Lee said that the aliens the officers were looking for were in an adjacent room (# 1409). One of the officers, while still standing in the doorway, observed the petitioner lying in a bed near the door. The officer noticed that petitioner was Oriental and decided to question him concerning his immigration status. The officer's testimony as to what then transpired, although not set out in full in the Board's opinion, was as follows:
"So after I decided that Mr. Chang and Mr. Wang were in the other room, I turned to this gentleman and asked him directly. I said, `Do you have any immigration papers to be in the United States?' When I asked that question, Mr. Lee turned and said something to the subject in Chinese, the subject said something to Mr. Lee in Chinese, and Mr. Lee turned around and said, `No, he doesn't.' Then I asked Mr. Lee, `How did he enter the United States, as a crewman?' Mr. Lee said, `Yes.' I said, `Approximately how long has he been here?' He said, `One year.' I then told Mr. Lee to tell him to get out of bed and get dressed and to pack his clothing because he was going to have to come to the Immigration Office with us. (emphasis supplied).
When the petitioner began packing, the officer "leaned in to see what was going on." Mr. Lee then stepped out of the way and the officer stepped into the room. When petitioner finished packing, he walked up to the officer, who was standing in the room near the door, and handed him a crewman's landing permit (Form I-95) without saying a word. No search of petitioner's person or possessions had been made up to this time. The officers did not have a warrant for petitioner's arrest and did not have any knowledge that petitioner was present in the hotel. The officer who arrested petitioner did so because he believed that petitioner might abscond since he had already deserted his ship.
The Board further found that petitioner is a native and citizen of China, who was admitted to the United States as a crewman on February 3, 1968 and remained longer than the period for which he was admitted. Petitioner's only argument at variance with the foregoing findings of fact is that the officers entered the hotel room without authority and permission prior to the time petitioner was awakened and questioned. The findings of fact are supported by reasonable, substantial and probative evidence on the record considered as a whole and are, therefore, conclusive. 8 U.S.C. § 1105a(a)(4).

I
Petitioner's first contention is that the initial questioning was unlawful because *574 it was occasioned solely on account of his race. Title 8, U.S.C. § 1357 provides in pertinent part:
"(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant
(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States[.]"
The Board did find that the officer decided to question petitioner concerning his immigration status because he observed that petitioner was Oriental. The Board also found, however, that the officers had just been told by Lee that the Oriental aliens they sought were in an adjacent room (# 1409). This information was unverified at the moment the officer asked petitioner about his immigration status. The record also shows that the officers had previously been told by the hotel manager that Lee had registered in room # 1409 but had moved to room # 1407.
Petitioner's failure to answer in English the officer's first question strongly suggested petitioner did not speak English and was therefore an alien. As the court said in Cheung Tin Wong v. United States Immigration and Naturalization Service, 468 F.2d 1123 (D.C. Cir. 1972):
"It is unlikely that an American citizen of oriental descent would be incapable of speaking English well enough to order a cab for himself. If he were a native Chinese-American presumably the nearly universal requirement for compulsory elementary education would have given him some facility in English; and English literacy is a statutory requirement for becoming a naturalized citizen. 8 U.S.C. § 1423 (1970). Circumstances suggesting an inability to speak English were thus sufficient grounds for [the officer's] suspicion that petitioner was an alien and Section 1357(a)(1) thus empowered him to `interrogate' petitioner `as to his right to be or to remain in the United States'."
In Cheung Tin Wong v. United States Immigration and Naturalization Service, 468 F.2d 1123 (D.C. Cir. 1972), the court said:
"We do not in any way intend to suggest that the appearance of being oriental is in any respect `suspicious', and we wish to state in unequivocal terms that we could never condone stopping or questioning an individual simply because he looked to be of oriental descent. Nonetheless, we need not be so naive as to blink at the reality of the fact that many of the aliens who illegally enter the United States each year are oriental seamen who desert their ships at such major seaports as New York, Philadelphia, and Baltimore in our geographical area."[1]
In United States v. Mendoza-Torres, 285 F.Supp. 629, 630 (D.Ariz.1968), immigration officers in an automobile observed the defendant hitchhiking and suspected he could be an illegal alien. The officers stopped, remained in the automobile, and one officer asked the defendant if he was a Mexican or United States citizen. The defendant responded that he was a Mexican citizen and the officer then asked to see his passport. Defendant replied that he did not have a passport. The officer then got out of the car and arrested the defendant. The court held: "[m]anifestly, the officer was within the area of the performance *575 of his duties in questioning the defendant under the facts here in evidence." Id. at 631. In United States v. Montez-Hernandez, 291 F.Supp. 712 (E.D.Calif. 1968), two immigration officers stopped an automobile and asked the occupants for "their papers" because two men in the back seat had looked at them with apparent nervousness. The court pointed out that "[d]etecting and apprehending illegal aliens is a special law enforcement problem" and upheld the officers' actions under § 1357(a)(1). And in United States v. Saldana, 453 F.2d 352 (10th Cir. 1972) two Border Patrol agents were maintaining traffic surveillance at a turnpike entrance located six to seven hundred miles from the Mexican border. The agents observed a truck with three occupants of Mexican descent stopped at the toll gate. The agents approached the truck and asked the driver to pull over. The agents inquired as to the citizenship of the two passengers and were told "Mexico". When the agents asked for immigration papers, they were told by the two that they had "swum the river." The agents then arrested the occupants and subsequently arrested the defendant Saldana, the driver of the truck, for illegally transporting aliens. The court said:
"Riding with Saldana in plain view of the immigration officers were two persons of obvious Mexican descent of whom the agents desired to make inquiry with reference to their right to be in the United States. Saldana was asked to move his car off the highway while this was done. This was a reasonable and routine discharge of the duties of competent officers and not an infringement of Saldana's rights." Id. at 354. Accord, United States v. Granado, 453 F.2d 769 (10th Cir. 1972).
It is unnecessary to determine here whether race alone may be a permissible basis for questioning an individual about his immigration status. The above cases as well as common sense show that race may be a relevant factor in some circumstances in determining whether to question a person about his immigration status. This court concludes that on the information known and observable to the officers, the questioning of petitioner was within the bounds of 8 U.S.C. § 1357(a)(1).

II
Petitioner contends that the initial questioning of him by the officer was unlawful because he was not advised of his right to counsel in violation of § 292 of the Immigration and Nationality Act, 8 U.S.C. § 1362 and the Fifth Amendment. Section 1362 is inapplicable because it guarantees the right to counsel only in proceedings before a special inquiry officer or in any appeal proceedings.
Petitioner argues, on the basis of the holding in United States v. Dickerson, 413 F.2d 1111 (7th Cir. 1969), that he was entitled to be informed of his right to counsel when his questioning had reached the accusatory stage. Only the Seventh Circuit has adopted that rule. In United States v. Brevik, 422 F.2d 449 (8th Cir. 1970), the Eighth Circuit said:
"We held in Cohen v. United States, 405 F.2d 34 (8th Cir. 1968), cert. denied, 394 U.S. 943, 89 S.Ct. 1274, 22 L.Ed.2d 478 (1969), that where an interview is of a non-custodial nature, as was concededly the case here, statements elicited or volunteered at such an interview are not tainted or inadmissible due to failure to give all of the Miranda warnings, even where such interview has reached the accusatory stage." Id. at 450.
There is no material difference between questioning by I.R.S. agents and immigration officers; inquiries by either could lead to civil or criminal proceedings against an individual.
Petitioner next argues that the questioning in his hotel room was "custodial" and therefore the holding in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), required the officers to warn him of his right to counsel. In Miranda v. Arizona, 384 U. *576 S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the court defined custodial interrogation:
"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444, 86 S.Ct. at 1612 (footnote omitted).[2]
The evidence shows that petitioner was in his hotel room and that the officers were standing outside the room at the time of the questioning. There is no showing that the police restricted the ability of the subject to leave the scene of the questioning. Nor was there testimony that the petitioner apprehended that he was not free to terminate the questioning on his decision to do so. Nor did the officers testify, as they did in Orozco v. Texas, 394 U.S. 324, 89 S. Ct. 1095, 22 L.Ed.2d 311 (1969), that the accused was not free to leave or was "under arrest." The questioning here was not intensive. The officer merely asked the petitioner if he had any immigration papers to be in the United States, and when informed that he did not, asked if he entered as a crewman and how long he had been here. Cf. United States v. Barnes, 150 U.S.App. D.C. 319, 464 F.2d 828 (1972). Moreover, the petitioner fully cooperated in answering the questions. The evidence clearly shows that petitioner's answers were given voluntarily and were not induced by any coercion, fraud or misrepresentation. See White v. United States, 395 F.2d 170 (8th Cir. 1968). The court concludes that the very limited questioning of petitioner occurred when he was in familiar surroundings, had not been taken into custody, or otherwise deprived of his freedom of action in any significant way. Therefore, in the circumstances, the officers were not required to warn petitioner of his right to counsel.

III
Petitioner's next contention is that his arrest was in violation of the Fourth Amendment. The Board of Immigration Appeals found:
"The officer who arrested respondent did so because it was the officer's belief that respondent might abscond since respondent had already deserted his ship."
Title 8, U.S.C. § 1357(a)(2) authorizes an immigration officer to:
". . . arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest. . . ."
Petitioner's answers to the officer's questions clearly gave the officer reason to believe that petitioner was in the United States in violation of law. The officer also reasonably concluded that petitioner was likely to escape before an arrest warrant could be obtained because the officer then knew that petitioner had previously deserted ship in violation of law with the apparent purpose of remaining in the United States when he was not authorized to do so. The petitioner does not point to, nor does the record show, any actions of the officers in this case which violated the Fourth Amendment.
For the foregoing reasons, the petition for a writ of habeas corpus is denied.
So ordered.
NOTES
[1] Petitioner has referred to a case in this circuit which mentioned the consideration of race as a factor in making an "investigatory stop" of an automobile. United States v. Nicholas, 448 F.2d 622 (8th Cir. 1971). There, the court noted that two individuals in the automobile were black men in a predominantly black area, and in a footnote stated that the court attached "no particular significance to this fact . . . [but] merely point[s] out that it would not be unusual to see black men in a predominantly black area." While this case may suggest that race alone is not a "suspicious circumstance", it does not hold that race is irrelevant in all circumstances.
[2] See McCormick on Evidence § 152(b), at 327 (2d ed. E. Cleary 1972); Annot. 31 A.L.R.3d 565.