BILL LOCKYER Attorney General ANTHONY S. DA VIGO Deputy Attorney General
THE HONORABLE LOU CORREA, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on the following questions:
1. Are the mandatory provisions of Penal Code section 834b
concerning cooperation, verification, and notification with respect to persons arrested who are suspected of being present in the United States in violation of federal immigration laws subject to enforcement by local law enforcement officers?
2. May a local law enforcement officer, during a detention of a Spanish- speaking person for otherwise valid purposes, question the person as to his or her immigration status?
3. May an arrested person's immigration status be investigated by local law enforcement officers prior to arraignment?
 CONCLUSIONS
1. The mandatory provisions of Penal Code section 834b concerning cooperation, verification, and notification with respect to persons arrested who are suspected of being present in the United States in violation of federal immigration laws are not subject to enforcement by local law enforcement officers.
2. A local law enforcement officer, during a detention of a Spanish-speaking person for otherwise valid purposes, may question the person as to his or her immigration status. However, a local officer may not question an individual as to immigration status solely because the individual speaks Spanish or other non-English language.
3. An arrested person's immigration status may be investigated by local law enforcement officers prior to arraignment.
 ANALYSIS
The three questions presented for resolution concern the procedures under which local police officers may ascertain whether a person is in the United States in violation of federal immigration laws and the consequences that may arise with respect to such determination.
1. Mandatory Provisions of Penal Code Section 834b
The first inquiry is whether law enforcement officers in California must comply with the mandatory provisions of Penal Code section834b[1] regarding persons who are suspected of being in the United States in violation of federal immigration laws. Section 834b
states:
 "(a) Every law enforcement agency in California shall fully cooperate with the United States Immigration and Naturalization Service regarding any person who is arrested if he or she is suspected of being present in the United States in violation of federal immigration laws.
 "(b) With respect to any such person who is arrested, and suspected of being present in the United States in violation of federal immigration laws, every law enforcement agency shall do the following:
 "(1) Attempt to verify the legal status of such person as a citizen of the United States, an alien lawfully admitted as a permanent resident, an alien lawfully admitted for a temporary period of time or as an alien who is present in the United States in violation of immigration laws. The verification process may include, but shall not be limited to, questioning the person regarding his or her date and place of birth, and entry into the United States, and demanding documentation to indicate his or her legal status.
 "(2) Notify the person of his or her apparent status as an alien who is present in the United States in violation of federal immigration laws and inform him or her that, apart from any criminal justice proceedings, he or she must either obtain legal status or leave the United States.
 "(3) Notify the Attorney General of California and the United States Immigration and Naturalization Service of the apparent illegal status and provide any additional information that may be requested by any other public entity.
 "(c) Any legislative, administrative, or other action by a city, county, or other legally authorized local governmental entity with jurisdictional boundaries, or by a law enforcement agency, to prevent or limit the cooperation required by subdivision (a) is expressly prohibited."
The provisions of section 834b are mandatory and prohibitory. Local law enforcement officers are to "fully cooperate with the United States Immigration and Naturalization Service," shall attempt to verify the legal status of certain arrested persons, and make certain notifications regarding violations of federal immigration laws.
Section 834b's terms, however, have been declared preempted by federal law and their enforcement has been permanently enjoined by a federal court. (League of United Latin American Citizens v. Wilson (C.D.Cal. 1995) 908 F. Supp. 755, 771, 776, sub. opn. (C.D.Cal. 1997)997 F. Supp. 1244, 1250, 1252, 1261.) Accordingly, the statute's provisions are not subject to enforcement by local law enforcement officers.
Nevertheless, do the federal court's rulings prohibit local law enforcement officers from voluntarily engaging in the conduct described in section 834b? In League of United Latin American Citizens v. Wilson, supra, 997 F. Supp. 1244, the court stated that not only could state and local government entities cooperate with federal immigration agents, federal law required them to do so and that "[n]othing in the Court's decision should be interpreted to proscribe cooperation between state officials and the I.N.S. pursuant to the [federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996]." (Id. at p. 1252, fn. 9; see City of New York v. U.S. (2d Cir. 1999) 179 F.3d 29,31-33.)
Hence, local law enforcement officers are not prohibited from cooperating with federal agents in the discharge of their duties. (See 75 Ops.Cal.Atty.Gen. 270 (1992).) Federal statutes provide that state and local governments may not be prohibited from cooperating with the Immigration and Naturalization Service. The Personal Responsibility and Work Opportunity Reconciliation Act of 1996, noted by the court in the 1997 Wilson, supra, decision, provides in part:
 "Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States." ( 8 U.S.C. § 1644.)
Similarly, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 provides in part:
 "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." (8 U.S.C. § 1373(a).)
In answer to the first question, we conclude that the mandatory provisions of section 834b concerning cooperation, verification, and notification with respect to persons arrested who are suspected of being present in the United States in violation of federal immigration laws are not subject to enforcement by local law enforcement agencies.
2. Questioning a Spanish-speaking Person's Immigration Status
The second inquiry is whether a local law enforcement officer who has stopped a Spanish-speaking person for otherwise valid purposes, such as for a driving infraction, may inquire during the detention as to the person's immigration status. We may assume that the stop was not made at or in the vicinity of a border station or known point of illegal entry. We do not consider it significant that the language spoken by the person is Spanish as distinguished from some other foreign language. The focus here is upon what a local peace officer may do during a lawful detention to ascertain the individual's immigration status.
An officer making such an inquiry would be engaged in the exercise of a federal power. (DeCanas v. Bica (1976) 424 U.S. 351, 354.) This characterization, however, would not resolve, but merely raise, the issue of whether the exercise of such local authority would be preempted by federal law. (Id. at p. 355.) As previously noted, Congress has expressly recognized the authority of state and local officers "to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." (8 U.S.C. § 1357(g)(10)(B).) Such provisions evince "a clear invitation from Congress for state and local agencies to participate in the process of enforcing federal immigration laws." (U.S. v. Vasquez-Alvarez (10th Cir. 1999) 176 F.3d 1294, 1300.) While Congress may invite local law enforcement officers to establish a person's immigration status, may the inquiry be made during a detention for an unrelated purpose such as a traffic violation?[2] The Fourth Amendment to the Constitution of the United States provides: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." Ordinarily, a judicial warrant issued on probable cause is necessary to render either a search or seizure of one's person or possessions reasonable. (United States v. Place (1983) 462 U.S. 696, 701.)[3] This right of personal security is inherent in the concept of due process, and therefore applies as well to state officers through theFourteenth Amendment. (Vernonia School Dist. 47J v. Acton (1995) 515 U.S. 646, 652; Elkins v. United States (1960) 364 U.S. 206, 213; 80 Ops.Cal.Atty.Gen. 354, 355 (1997).)
In addition, section 1 of article I of the California Constitution, as amended by the 1972 "privacy initiative," provides: "[a]ll people are by nature free and independent and have inalienable rights. Among these are . . . pursuing and obtaining safety, happiness, and privacy." The state's privacy guarantee operates separately and in addition to theFourth Amendment's protections against unreasonable searches and seizures. For our purposes, however, we need not distinguish between the state and federal constitutional guarantees. (See In re Williams G. (1985)40 Cal.3d 550, 557, fn. 4.)
The protections of the Fourth Amendment apply to brief investigatory stops made by law enforcement officers. In United States v. Cortez (1981)449 U.S. 411, 417, the court observed:
 "The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle here. [Citations.] An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. [Citations.]" (Fn. omitted.)
Here, we have a valid stop and detention of a person who does not speak English. In I.N.S. v. Delgado (1984) 466 U.S. 210, 215-217, the court stated with regard to the questioning of persons as to their immigration status:
 "The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed `to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' [Citation.] Given the diversity of encounters between police officers and citizens, however, the Court has been cautious in defining the limits imposed by the Fourth Amendment on encounters between the police and citizens. As we have noted elsewhere: `Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' [Citation.] While applying such a test is relatively straightforward in a situation resembling a traditional arrest, [citation], the protection against unreasonable seizures also extends to `seizures that involve only a brief detention short of traditional arrest.' [Citation.] What has evolved from our cases is a determination that an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, `if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' [Citation]; see Florida v. Royer, 460 U.S. 491, 502 (1983) (plurality opinion).
 "Although we have yet to rule directly on whether mere questioning of an individual by a police official, without more, can amount to a seizure under the Fourth Amendment, our recent decision in Royer, supra, plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure. In Royer, when Drug Enforcement Administration agents found that the respondent matched a drug courier profile, the agents approached the defendant and asked him for his airplane ticket and driver's license, which the agents then examined. A majority of the Court believed that the request and examination of the documents were `permissible in themselves.' [Citations.] In contrast, a much different situation prevailed in Brown v. Texas, 443 U.S. 47
(1979), when two policemen physically detained the defendant to determine his identity, after the defendant refused the officers' request to identify himself. The Court held that absent some reasonable suspicion of misconduct, the detention of the defendant to determine his identity violated the defendant's Fourth Amendment right to be free from an unreasonable seizure. [Citation.]
 "What is apparent from Royer and Brown is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. [Citation.] Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the person refuses to answer and the police take additional steps-such as those taken in Brown-to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure. [Citations.]"
In Delgado, federal immigration agents questioned employees at a factory regarding their immigration status. During the survey, which lasted from one to two hours, the agents positioned themselves near the factory exits while others moved systematically through the factory, approaching employees and, after identifying themselves, asking the employees from one to three questions relating to their citizenship. Meanwhile, employees continued their work and were free to walk around within the factory. Certain employees, who were citizens or permanent resident aliens, contended that the surveys violated their rights under theFourth Amendment. The employees argued that the element of surprise, the systematic questioning of individual workers, the stationing of agents near the exits of the factory, and the failure to inform workers that they were free to leave created an intimidating psychological environment which negated any reasonable impression that they were free to leave without answering the questions. Nevertheless, the United States Supreme Court ruled that the conduct of the immigration agents, consisting simply of questioning employees and arresting those they had probable cause to believe were unlawfully present in the United States, "should have given respondents no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer." (Id. at p. 218.)
Here, we note that the authority of state and local law enforcement officers to investigate and arrest for violations of federal law is determined by reference to state law. (U.S. v. Vasquez-Alvarez, supra, 176 F.3d at pp. 1295-1296; Gates v. Superior Court (1987)193 Cal.App.3d 205, 215; see, e.g., 8 U.S.C. § 1252c [". . . to the extent permitted by relevant State and local law, State and local law enforcement officials are authorized to arrest and detain an individual who . . . is an alien illegally present in the United States. . . ."].) In California, a local peace officer may make an arrest when an individual has committed a felony, or where reasonable cause exists to suspect that a person has committed a felony, whether or not a felony has been committed. (§ 836, subd. (2), (3).)[4] Therefore, a local officer may arrest for a felony violation of federal immigration law any time the officer has reasonable cause to believe such a violation has occurred. (Gates v. Superior Court, supra, 193 Cal.App.3d at p. 215.) Inasmuch as a local law enforcement officer is authorized under state and federal law to make such an arrest, and to exchange information pertaining to immigration status with federal authorities (id. at p. 219), it follows that a local law enforcement officer may question an individual as to his or her immigration status.
In answer to the second question, therefore, we conclude that a local law enforcement officer who has detained a Spanish-speaking person for otherwise valid purposes may question such person as to his or her immigration status. It is emphasized, however, that for purposes of the question here considered, the inquiry as to alienage was not posited because the individual spoke Spanish. A contrary supposition would produce an entirely different result. Thus, it has been held that ethnic appearance is not, in general, an appropriate factor in the reasonable suspicion calculus. (United States v. Montero-Camargo (9th Cir. 2000)208 F.3d 1122, 1132.) While suspicion is not a constitutional prerequisite for inquiry as to alienage, such an inquiry directed selectively to individuals who speak a language other than English would be tantamount to an aspect of the practice commonly referred to as racial profiling, where sound is substituted for appearance or other indicia of ethnicity. It has been noted that primary language skill flows generally from one's national origin. (Berke v. Ohio Department of Public Welfare (6th Cir. 1980) 628 F.2d 980, 981; Yu Cong Eng v. Trinidad (1926) 271 U.S. 500,517.) In the context presented here, therefore, a non-English speaking classification is, for all practical purposes, a classification based on national origin. Such a selective enforcement would clearly violate the equal protection clause of the Fourteenth Amendment of the United States Constitution.
3. Investigations of Arrested Persons Prior to Arraignment
The third inquiry is whether an arrested person's immigration status may be investigated by local law enforcement officers prior to arraignment. This inquiry is based upon a federal program established by Congress in 1997. (Pub.L. No. 105-141 (Dec. 5, 1997) 111 Stat. 2647 [see note under 8 U.S.C.A. § 1226].) The legislation provides as follows:
 "(a) . . . [T]he Attorney General shall establish and implement a program to identify, from among the individuals who are incarcerated in local governmental incarceration facilities prior to arraignment on criminal charges, those individuals who are within 1 or more of the following classes of deportable aliens:
"(1) Aliens unlawfully present in the United States.
 "(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
"(b) The program authorized by subsection (a) shall include —
 "(1) the detail, to each incarceration facility selected under subsection (c), of at least one employee of the Immigration and Naturalization Service who has expertise in the identification of aliens described in subsection (a); and
"(2) provision of funds sufficient to provide for —
 "(A) the detail of such employees to each selected facility on a full time basis, including the portions of the day or night when the greatest number of individuals are incarcerated prior to arraignment;
 "(B) access for such employees to records of the Service and other Federal law enforcement agencies that are necessary to identify such aliens; and
 "(C) in the case of an individual identified as such an alien, pre-arraignment reporting to the court regarding the Service's intention to remove the alien from the United States.
 ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."
We are not apprised as to the manner in which this federal program is being implemented by federal immigration agents at any particular local incarceration facility. It will be assumed, therefore, that the selection criteria are constitutionally sufficient. The actual arraignment of an individual on formal charges is clearly not a prerequisite for an otherwise proper investigation of immigration status under the federal law. In the case of an individual who is determined to be present in the United States unlawfully, the local magistrate will be apprised of the true identification of the person and will receive a report regarding the intention of the federal Immigration and Naturalization Service to remove the alien from the United States.
Consistent with our conclusions to questions one and two and in answer to the third question, we conclude that an arrested person's immigration status may be investigated by local law enforcement officers prior to arraignment.
 * * * * *
[1] All references hereafter to the Penal Code are by section number only.
[2] We do not have the issue of whether the stop itself may be justified because the person is heard speaking a foreign language. (See, e.g., United States v. Cortez (1981) 449 U.S. 411, 417; State v. Kettlewell (Vt. 1987) 544 A.2d 591; Cheung Tin Wong v. United States Immigration Nat. Serv. (D.C. Cir. 1972) 468 F.2d 1123; Hon Keung Kung v. District Dir., Immigration Nat. Serv. (E.D.Mo. 1973)356 F. Supp. 571.)
[3] The warrant clause of the Fourth Amendment states that ". . . no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
[4] In the case of both felonies and misdemeanors, a California peace officer is further authorized to make an arrest either in obedience to a warrant, or without a warrant where the officer has probable cause to believe that a public offense has been committed in the officer's presence. (Pen. Code, § 836, subd. (a), (a)(1).) Civil violations of immigration law are not cognizable under this formula.