**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Donald Eugene HICKMAN, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Thomas Henry LANDERS, Defendant-Appellant.**

Nos. 74–2559, 74–2560.

United States Court of Appeals, Ninth Circuit.

Sept. 2, 1975.

Certiorari Denied Jan. 12, 1976.

See 96 S.Ct. 778.

324

Charles L. Goldberg (argued), San Diego, Cal., for defendants-appellants.

James Meyers, Asst. U. S. Atty. (argued), Harry D. Steward, U. S. Atty., San Diego, Cal., for plaintiff-appellee.

OPINION

Before BROWNING and WRIGHT, Circuit Judges, and ZIRPOLI, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

Appellants were each convicted on four counts of conspiracy to import, conspiracy to possess with intent to distribute, and importation and possession of a controlled substance. The case was tried without a jury on stipulated facts and the testimony of a single witness. Appellants argue that the trial judge erred in failing to suppress approximately a ton of marijuana which they allege was uncovered in an unlawful search. We affirm.

Appellants were involved in a smuggling operation involving the importation of large quantities of marijuana from Mexico by boat. Appellants had purchased identical 24-foot, white power cruisers. They then had altered one boat by extending its deck into the forward cuddy cabin area and creating a hidden compartment extending the length of the craft which could be packed with a ton of marijuana bricks. Although each boat had been properly registered to its respective owner, the identification number on the side of Landers' boat had been changed so that it carried the same registration number, CF9802FB, as that assigned to Hickman's boat.

One boat would be towed into Mexico by truck, packed with marijuana, and then launched at a Mexican port. It would then sail to Mission Bay in San Diego, be hauled from the water, then driven away without passing through customs. The other boat would then be sailed to the Mexican port by the first crew and returned to the United States on a trailer, passing through customs on the basis of its identical bow number. The presentencing report indicated that appellants had undertaken this venture on three previous occasions and had been paid $10,000 for each delivery.

On May 12, 1973, a special customs agent received a tip from a confidential informant that a 24-foot, white power cruiser with registration number CF9802FB had arrived in Mission Bay at 11:00 p.m. the night before under suspicious circumstances with appellants Hickman and Landers on board.

A check at the registration number of the boat indicated that it belonged to Hickman. A check at a nearby hotel revealed that Landers had registered there and had rented a slip for a boat. The car license number listed on the motel registration card, JM6300, proved to be that of a boat trailer registered to a third party in Modesto, California, Hickman's home town. This trailer was used to transport the appellants' boats.

From the Customs computer the agents learned that Hickman had been under suspicion for pill smuggling. The Modesto Sheriff's Office provided information from an informant which linked appellants with narcotics trafficking. A subsequent search for information on Landers revealed that he owned an identical boat with a registration number only one digit different from Hickman's.

A surveillance of the Mission Bay area was rewarded on May 25 by a report that an empty boat trailer with license JM6300 was being pulled from the Dana launching ramp dripping wet. A customs agent soon located both the trailer and the towing truck. A woman, later identified by hotel records as Hickman's wife, was seen leaving the truck and walking to meet an unidentified man coming from a nearby pier at Islandia Marina. The two then drove to the Dana Hotel and entered.

Agent Davis, in charge of the surveillance operation, walked to the pier and observed a 24-foot boat covered with a tarpaulin which overlapped the edge of the boat and covered its bow number. He lifted the tarpaulin sufficiently to ascertain that the registration number was CF9802FB. Both the boat and trailer were kept under surveillance.

* Of the Northern District of California.

The following morning the agents covering the trailer reported that a man and woman had taken the trailer and moved it to the Dana Ramp to pick up a power cruiser with the registration number CF9802FB. Agent Davis, who was watching the boat with the same number still moored at Islandia Marina, requested the agents at the launching ramp to stop the boat for questioning.

Agent Matteson pulled his car in front of the truck towing the second boat and stopped it. He identified himself as a customs agent and asked for identification. The driver of the vehicle was Hickman, the passenger was his wife, and the two men in the towed boat were codefendant Prater and appellant Landers.

When Agent Matteson asked who owned the truck, trailer, and boat, Hickman replied that he did. This reply conflicted with the fact that the trailer was registered to a third party. On questioning, the group indicated that they had not made a customs declaration in San Diego although they indicated that they had been fishing near the Coronado Islands in Mexican waters. The parties stipulated at trial that:

> Agent Matteson stated, "We would like to search your boat; would you mind if we searched your boat?" Hickman replied, "No, I don't mind; you can search it." Agent Matteson then advised Hickman of his Constitutional rights to which Hickman replied, "I understand; I'm willing to talk to you."

The agents began a search of the boat, noting that it had an unusual configuration in that the cuddy cabin was not lower than the deck aft and that additional gas tanks had been installed above deck. They began to examine materials in the stern of the boat and to dismantle the extra gas tanks.

Agent Gore, who arrived at the Dana Ramp site shortly after the search began, decided to "try to find out who the other boat belonged to that was at Slip D–9 with the identical" registration number on its bow. R.T. 82, 83, 92. He returned to the moored boat, boarded it, and checked for registration.[1] He looked around the boat and determined that its hull configuration conformed to the specifications which he had previously found in the manufacturer's brochures.

Returning to the boat at the ramp, he began a search of the forward cabin area, found a manhole cut into the deck, and approximately a ton of marijuana bricks in the compartment underneath. Appellants were then arrested.

Appellants argue that the evidence turned up in the search should have been suppressed. They assert that the initial detention at the boat ramp was an arrest and that their responses to questions were thus improper because a *Miranda* warning was not given until later.

They argue in the alternative that if the initial stop was not an arrest, there was no "founded suspicion" for it. Hence, they claim that any subsequent search was tainted.[2]

Appellants also argue that the stop and the subsequent discovery of the marijuana were tainted by the two warrantless searches of the decoy boat while it was moored at the Islandia Marina.

I.

## MIRANDA WARNINGS

■ Appellants contend that the initial stop of the truck and boat constitut-

---

**1.** The parties stipulated that the decoy boat contained a temporary registration permit listing Hickman as the owner and CF9803FB as its registration number. CR22.

**2.** Appellants argue that permission for the search was not given. After an evaluation of the testimony of the parties, the trial judge found that Appellant Hickman's reply to the officer's request amounted to "consent to search under these circumstances." This is supported by the fact that during the search, Hickman approached the boat to determine "how bad you're tearing up my boat" and made no objection to the continuation of what was obviously a full-scale search. From the context of these statements it is clear that Hickman granted a general permission to search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

ed a significant impairment of their freedom and thus necessitated the warning required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before appellants were questioned. We do not agree. No weapons or threats were used to effectuate the stop. The subsequent questioning was not conducted in the "police dominated" and "compelling atmosphere" to which *Miranda* applies. 384 U.S. at 445, 478, 86 S.Ct. 1602.

■ The circumstances were essentially the same as those presented in the usual routine highway-stop-and-inquiry situation to which *Miranda* has been consistently held inapplicable. *See, e. g., Lowe v. United States*, 407 F.2d 1391, 1393–94 (9th Cir. 1969); *United States v. Smith*, 441 F.2d 539 (9th Cir. 1971); *see also United States v. Bekowies*, 432 F.2d 8, 12 (9th Cir. 1970); *cf. United States v. Montos*, 421 F.2d 215, 221–23 (5th Cir. 1970) (the fact that defendant's exit was blocked by postal inspector's car does not mean that questioning of defendant was "custodial interrogation").

There is nothing in the record to support appellants' contention that the agents made a prior determination to arrest appellants regardless of their responses to questioning and of the results of any legitimate search which might follow.

■ Since we have determined that appellants were not in a "police dominated" and "compelling atmosphere" from the time they were initially stopped for questioning until the time the *Miranda* warning was given, their contention that statements made during this period were improperly admitted against them must also fail.

■ Appellants contend that the questioning was inquisitorial, not investigatory. We disagree. An officer making an investigatory stop will often have some suspicion of the identity of the person apprehended and of his prior unobserved activity. It is the very purpose of the investigatory stop to allow the officer to confirm or deny these suspi-

cions by reasonable questioning, rather than forcing in each instance the "all or nothing" choice between arrest and inaction. As we held in *United States v. Camacho*, 506 F.2d 594, 595 (9th Cir. 1974), "[m]ere request for written identification of a person, even a suspect, by law enforcement or security officers, does not necessitate the giving of *Miranda* warnings."

■ Agent Matteson's questions to Hickman dealt merely with his identity, ownership of the boat he was towing, and where he had taken the boat. Each area of inquiry was thus directly related to the agents' reasonable suspicion that smuggling activities were taking place which they had a duty to curtail. Since the questioning did not go beyond the purpose of the investigatory stop, it cannot be found to have changed the situation into the type recognized by this court as requiring a *Miranda* warning.

## II.

### FOUNDED SUSPICION

■ Appellants argue that the agents lacked founded suspicion to stop and question them. The record does not support them. The agents who stopped the appellants were confronted with sufficient factors to constitute a founded suspicion necessary to stop and question based on: (1) the discovery that the appellants were involved with two identical boats with the same, supposedly unique registration number; (2) the tip from an assertedly reliable informer that the boat with appellants aboard had earlier arrived in Mission Bay under suspicious circumstances, corroborated by the registration number on the arriving boat and identification of the appellants by motor vehicle and hotel registration data; and (3) appellants' unusual activities in an area noted for a high number of smuggling violations.

While these factors might be insufficient standing alone, *see, e. g., United States v. Larkin*, 510 F.2d 13 (9th Cir. 1974) (tip of unidentified informer held insufficient by itself), the cumulative im-

pact provided the customs agents a founded suspicion for stopping the boat and truck and questioning their occupants.

### III.

#### SEARCH OF THE DECOY BOAT

Appellants argue that the discovery of the ton of marijuana in the load boat was tainted by the two searches of the second boat which was moored at Islandia Marina. The first search consisted of Agent Davis' lifting the covering tarpaulin sufficiently to read the registration number on the bow of the moored boat. The second involved Agent Gore's search for registration papers and his concurrent observation of the configuration of the interior of the boat. Neither can be characterized as an improper search.

Appellants were required to have their boats marked with a unique registration number [46 U.S.C. § 1467 (1970); 33 C.F.R. § 174.1–174.7 (1974)] which must be displayed on each side of the forward half of the vessel "in order that it may be clearly visible." Cal. Vehicle Code § 9853.2 (Supp. 1975); see also 46 U.S.C. §§ 1467(a) & 1470 (Supp. III, 1973).

Agent Davis lifted the tarpaulin only enough to see the registration number and corroborate the informant's tip. Appellants had no "reasonable expectation of privacy" in this circumstance, since they were required to display the registration number for observation.

■ Absent harassment or intimidation, no violation of Fourth Amendment rights are involved in a "search" which merely uncovers a registration number which by law must be displayed in a "clearly visible" manner.

Here no untoward conduct on the part of Agent Davis was involved. He sought only to determine the identification of the boat following a tip by a reliable informer and evidence that the same boat had just been launched. (The boat trailer involved in the earlier incident was reported leaving the launching ramp and the driver of the tow vehicle

was seen picking up an unidentified male returning from this pier.) The boat was moored at a public dock and no intrusion was made other than a minimal lifting of a canvas cover to expose the bow number.

■ Similarly, the second search of the decoy boat was a proper one. In general, searches conducted outside the judicial process are *per se* unreasonable subject to a few well-established exceptions. *Katz v. United States*, 389 U.S. 347, 356, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One exception is provided in circumstances where there is probable cause to believe that a crime has been committed and that the vehicle in question contains evidence of the crime and where there is danger that the suspect vehicle will escape the jurisdiction during the time necessary to obtain a judicial warrant. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

Here the parties have stipulated that appellant Hickman gave permission to search the load boat. However, the agents also had probable cause to search it based on the factors, discussed above, which provided the founded suspicion for the stop, the fact that appellants reported that they had not made a customs declaration in San Diego but had come from Mexican waters, and Hickman's statement of ownership of the boat trailer at a time when it carried a license showing ownership by a third party.

With the exception of the statement showing arrival from international waters, these same factors apply to the decoy boat. The fact that it carried the same registration number as the load boat and was an identical model provided the agents with a strong inference that it was being used as part of a smuggling operation. Since the boats were identical externally, the agents needed to determine the ownership of the decoy boat in order to determine whether Hickman was lying in claiming ownership of the load boat and why the boats had the same registration number.

Given the totality of these circumstances, Agent Gore had probable cause for entering the decoy boat in search of its registration papers and any indicia of ownership. Similarly, the evidence that it was being used by the appellants provided a basis for entering the decoy boat to compare its internal configuration with that of the boat being searched at the launching ramp.

The search falls within the *Chambers* exception to the warrant requirement since the agents could reasonably believe that other members of the conspiracy might move it. At this stage in the investigation it was not evident how many persons were involved. Indeed the agents could not discount the possibility that the registered owner of the boat trailer was actively involved and in the area ready to assist in concealing evidence of wrongdoing. Moreover, the agents could believe that, without evidence gained from the decoy boat, the appellants and their co-defendants might have to be released after a fruitless search of the load boat. They then could have moved the decoy boat (as in fact was their plan).

Hence there was more than a "generalized fear that an unknown person [would] move the vehicle." *United States v. Connolly*, 479 F.2d 930, 935 (9th Cir. 1973). The only known operator was not under arrest as in *United States v. McCormick*, 502 F.2d 281, 287 (9th Cir. 1974) and evidence that the boat was currently being used in a criminal activity was not lacking as in *McCormick*. Although the agents had known of the decoy boat's presence since the night before, they did not know until an hour earlier that there were two boats involved with the same registration number. Lacking that knowledge and the information elicited from appellants about their recent border crossing, the agents lacked probable cause at an earlier time to seek a search warrant. Given the exigent circumstances at the time, search of the decoy boat was proper.

The decision of the district court is affirmed.

ZIRPOLI, District Judge (concurring in part and dissenting in part).

I find myself in agreement with the majority's position on most of the contentions made by appellants. I agree that the agents had a founded suspicion to stop the load boat,[1] that they need not have given *Miranda* warnings any sooner than they did, and the appellants had no reasonable expectation of privacy as to the registration number on the decoy boat. I see no reason to speculate on whether the agents had probable cause to search the load boat because the trial court found that Hickman had consented to the search of that boat and his finding is not clearly erroneous. See R.T. 275–76; *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).[2] I must disagree with the major-

1. In reaching the conclusion that there was a founded suspicion to justify the stopping of the load boat, like the majority, I place no reliance on the information received from an informant and submitted to the trial court for *in camera* inspection. The *in camera* hearing was apparently outside the presence of counsel for defendant or the government, and was directed entirely to the question of whether the identity of the informant should be revealed to defendants. Under these circumstances it should not suddenly reappear on appeal through a sealed record to redeem what I view to be a questionable ruling on the motion to suppress.

2. The majority relies on a stipulation entered into by appellants and the government after the motion to suppress was denied to support its conclusion that Hickman consented to the search of the load boat. Given the trial court's finding of consent, referred to in the text, I see no reason to rely on the stipulation. Moreover, I doubt the wisdom of using stipulations entered into after a motion to suppress is denied as a ground for affirming the denial of the motion to suppress. Such a practice might deter defendants who wish to preserve their search-and-seizure issues for appeal from entering into stipulations for purposes of trial after the trial court has denied their motions to suppress. Additionally, the propriety of the ruling on the motion to suppress should, to my mind, be based on the record before the court at the time it rules on the motion; it seems improper to me to rehabilitate it on the basis of stipulations the parties enter into thereafter.

ity's conclusion that the agents had probable cause to search the decoy boat when they did. However, since Hickman nowhere claimed (as he presumably could not) that he had a possessory interest in the decoy boat, I concur in the majority's affirmance as to him. See *Brown v. United States*, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). Landers, however, affirmed on the witness stand that the decoy boat was his. R.T. 240–41. Since two of the four counts on which he was convicted were for possession, he has "automatic standing" to object to any search of the load boat that was the product of an illegal search of the decoy boat. See *United States v. Boston*, 510 F.2d 35 (9th Cir. 1974). I therefore dissent from the affirmance as to Landers.[3]

Since the trial court did not find that the agents had probable cause to search the decoy boat,[4] this court need not indulge any presumption that the trial court did correctly so conclude. Instead, the majority concludes that the agents had probable cause to search the decoy

boat principally in reliance on the factors it recites to provide a founded suspicion to stop the load boat: (1) the discovery that appellants had two identical boats with the same registration number; (2) the tip from an informant that a boat with appellants aboard had earlier arrived in Mission Bay "under suspicious circumstances"; (3) information from an informant in Modesto (the *in camera* material) that appellants had been involved in narcotics trafficking; (4) appellants' unusual activities in an area noted for a high number of smuggling violations. In addition, the majority points to the fact that when questioned after being stopped, appellants reported that they had not made a customs declaration even though they had come from Mexican waters and that Hickman said he owned the boat trailer although the agents knew it was registered to a third party.

Absent the *in camera* material, I cannot agree that these circumstances provide probable cause to search the decoy boat. While the majority concludes that these circumstances provided "a strong

---

**3.** Landers was sentenced to five years' imprisonment on each count of the indictment, with the sentences on the possession counts and the sentences on the importation counts to run concurrently. While it may be that Landers does not have standing to object to the search of the load boat on the importation counts, compare *United States v. Wing*, 450 F.2d 806, 810 (9th Cir. 1971), I see no reason to reach that issue since the majority affirms as to all four counts and since the concurrent sentence doctrine does not apply in this case. See *United States v. Moore*, 452 F.2d 576 (9th Cir. 1971).

**4.** Concerning the decoy boat, the district court reasoned as follows:

Going back to the Landers boat [the decoy boat] and opening the boat up and looking at the configuration of the boat really is of no great consequence, because there was nothing found in that boat, and there is really no standing to object. The fact that that particular act led to the noticing of the differences in the boats, as far as this court is concerned, nobody that I have heard on the stand claimed even any ownership in the boat at the Islandia, except perhaps in kind of a backhanded manner. There was really no objection to that search, in that there was no contraband found in the boat, if it

was a search. I think it would be better characterized as an inquiry to determine whether or not the boat that they had a right to search looked like the other boat that was supposed to be identical, with the same hull number.

I can't find that, while that act might have been an intrusion into the boat, that that was or would taint the discovery, as the search had already been in progress. It would not taint the discovery of the marijuana that was subsequently found as a result of the comparison of the configurations of the interior of the two boats.

R.T. 277. Clearly the district court did not conclude that the agents had probable cause to search the decoy boat. Compare R.T. 271. Equally clearly, it seems to me, the district court's factual determination that the agents found the marijuana "as a result of the comparison of the configuration of the interior of the two boats" requires us to conclude that that discovery was tainted if the second search of the decoy boat was illegal. See *United States v. Bacall*, 443 F.2d 1050, 1056–57 (9th Cir.), cert. denied, 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971). The majority therefore attempts to justify the search of the decoy boat on the theory that it was supported by probable cause.

inference that [the decoy boat] was being used as part of a smuggling operation," it appears to me that the agents had no more than a vague suspicion or hunch prior to their search of the decoy boat. The only really persuasive fact is that appellants had two boats with the same hull number, which does look suspicious in combination with the incidence of smuggling in the Mission Bay area. The informant's tip about their earlier arrival—under "suspicious circumstances"—is so vague as not to add much to the suspicions engendered by the identical hull numbers; it was merely the stimulus that prompted the agents to investigate and discover the identical hull numbers. At the time they stopped the load boat, therefore, the agents had very little beyond a founded suspicion to justify searching it. Since Hickman consented to the search, they needed no more.

The developments after the load boat was stopped hardly provided further justification to search the decoy boat. The majority points out that appellants admitted that they had failed to make a customs declaration although they had been in Mexican waters. Whatever impact that admission might have on the propriety of searching the load boat, it does not, as the majority notes, have any bearing on the decoy boat. Additionally, it appeared that Hickman may have misspoken when asked who owned the trailer. But it is apparent from the record of the hearing on the motion to suppress that what the agents were interested in was the boat; his oversight in failing to explain that while he owned the boat he did not own the trailer does not provide more reason to believe he was engaged in smuggling. Instead, the events that followed the stop really operated to vitiate any probable cause that the agents may have had at the outset simply because they were unable, after an hour of searching the load boat, to find anything. The agents' suspicions were not confirmed, but refuted.

The majority does not confront this dilution of whatever probable cause the agents had when they first stopped the load boat. Instead, it suggests that "the agents needed to determine the ownership of the decoy boat in order to determine whether Hickman was lying in claiming ownership of the load boat and why the boats had the same registration number." I am not aware of any doctrine that makes need, which might affect the warrant requirement, a substitute for probable cause. Moreover, I see no reason why, after they had spent an hour searching the load boat, the agents had any such need to search the decoy boat. If they were concerned about whether Hickman really had authority to consent to a search of the load boat, it is odd that they waited so long to verify that he did. If they wanted to verify that Hickman owned the load boat, I do not see why they needed to search the decoy boat to do so. It is clear from the record that the reason Agent Gore returned to the decoy boat was that he expected to find there the key to the puzzle of how the contraband was secreted on the load boat. He had no immediate need to find a registration for the decoy boat.

Under these circumstances, the majority's reliance on *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), is misplaced, because, at the time they began their search of the decoy boat, the agents had only their vague (and by that time refuted) suspicions that a crime had occurred at all. In *Chambers* the situation was very different. A robbery had occurred, and two teen-agers reported seeing a station wagon speeding away from the scene of the crime. Within an hour, police stopped a station wagon fitting the description given by the two teen-agers, arrested the occupants, and took the car into custody. *Id.* at 44, 90 S.Ct. 1975. The issue before the Supreme Court was whether the police should have obtained a search warrant before searching the car even though they had probable cause to search it when they stopped it. The Court held that they did not have to do so. There was no question but that a

**332**

robbery had been committed and that the police had probable cause, based on the description of the robbers they had received, to arrest petitioners for the robbery. Here, in contrast, at the time Agent Gore departed to search the decoy boat, he had no facts at his command that indicated that any crime (save perhaps some technical violation in relation to the identical registration numbers) had been committed; *Chambers* cannot be used to support what was essentially a fishing expedition.