UNITED STATES of America, Plaintiff,

v.

Paul Oliver KELLER, Michael Joseph Arra, Steven Scott Aschinger and Overton Baker Pettit, Defendants.

Crim. No. 78–4.

United States District Court,
D. Puerto Rico.

May 22, 1978.

Ralph Vallone, Jr., Hato Rey, P. R., for defendants.

José A. Quiles, U. S. Atty., San Juan, P. R., for plaintiff.

## DECISION AND ORDER

TORRUELLA, District Judge.

This matter is before us on issues raised by Defendants in Motions to Suppress and Dismiss wherein they allege the lack of jurisdiction of this Court, the violation of rights secured by the Fourth Amendment against unreasonable searches and seizures, and the failure to give prompt *Miranda* -type warnings. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Defendants are charged in a three-count indictment, the first of which alleges that between November, 1977 and January 5, 1978, on the high seas within the special maritime jurisdiction of the United States, they conspired to import 13,303 pounds of marihuana into the United States, all in violation of 18 U.S.C. §§ 7, 3238 and 21 U.S.C. § 963. The second count charges that sometime between December 28, 1977 and January 1, 1978, on the high seas within the special maritime jurisdiction of the United States, the Defendants aiding and abetting each other possessed with intent to distribute 13,303 pounds of marihuana, all in violation of 18 U.S.C. §§ 2, 7 and 3238

and 21 U.S.C. § 841(a)(1). The last count charges that from December 28, 1977 through January 5, 1978, on the high seas within the special maritime jurisdiction of the United States, the Defendants aiding and abetting each other attempted to import into the United States 13,303 pounds of marihuana, all in violation of 18 U.S.C. §§ 2, 7 and 3238 and 21 U.S.C. § 963.

A hearing was held in which the following facts came to light: On January 5, 1978 at approximately 1350 hours, United States Coast Guard Helicopter Number 1470 based in San Juan, Puerto Rico, sighted the M/V GREAT MYSTERY in a location 15 miles North of Arecibo, Puerto Rico, proceeding in a westerly direction. The GREAT MYSTERY is an oil screw vessel of 71 feet l. o. a., 55 net tons. This vessel was on a list of vessels suspected of engaging in violation of the laws of United States,[1] and thus its sighting was reported to the Coast Guard Operations Center in San Juan. This information was relayed to Seventh District Headquarters, who in turn ordered covert surveillance of the GREAT MYSTERY by the helicopter and directed the dispatching of a cutter to investigate on the scene. The Coast Guard cutter POINT WARDE was ordered out at approximately 1430 hours with instructions to plot the interception of the suspect vessel. Meanwhile the helicopter trailing the GREAT MYSTERY reported that the vessel showed Florida registration numerals. When this information was passed on to Miami it was discovered that the apparent owner of the GREAT MYSTERY was a Grand Cayman corporation by the name of Caribbean Diversified Concepts, Ltd.

At approximately 2230 hours the POINT WARDE intercepted the GREAT MYSTERY in a location about 35 miles North of Punta Borinquen, Puerto Rico, at 19°00′ North Latitude, 67°37′ West Longitude. The GREAT MYSTERY was on a heading of West by North West. The scene was illuminated by a search light from the cut-

---

1. This list is published weekly by the Coast Guard, Seventh District Headquarters in Miami, Florida.

ter and a bright light (commonly referred to as the "midnight sun") from the helicopter. The intercepted vessel was not flying any flag and no home port was indicated below the name painted on her stern.[2] Florida registration numbers were prominently shown on both sides of the vessel.

The crew of the GREAT MYSTERY, the four Defendants herein, had been aware of the presence of the Coast Guard since the helicopter was first sighted in the early afternoon as it made a close pass by the ship's bow. During the rest of the afternoon the aircraft was seen at a distance. At dusk the ship's radar showed two contacts, one of which was on the surface. Upon observation through night binoculars, the surface contact proved to be a Coast Guard cutter. The crew of the GREAT MYSTERY kept both the helicopter and cutter under continuous visual and radar observation until intercepted.

The POINT WARDE hailed the GREAT MYSTERY by voice radio, which hail was answered by Defendant Baker. He was asked the registry of the vessel, the last port of call, the next port of call and the nationality of the vessel. He answered that it was a "U.S. vessel coming from Curacao, en route to Florida." He also informed the Coast Guard that he was not the skipper of the vessel and that he was calling the skipper to come on the radio. Shortly thereafter the skipper of the GREAT MYSTERY, Defendant Keller, came on the radio and in response to similar inquiries indicated that it was a "U.S. vessel headed to Ft. Lauderdale." When asked if she carried cargo, he responded in the negative and indicated that it was a pleasure trip.

This conversation was being monitored[3] by the Operations Center of San Juan, who in turn advised District Headquarters of the developments. Miami ordered that the POINT WARDE send a boarding party to conduct an administrative inspection of the GREAT MYSTERY's safety equipment.

After informing the GREAT MYSTERY of the intended action, a small boat was put over the side by the POINT WARDE and a boarding party consisting of a coxswain, a petty officer and two able-bodied seamen proceeded to the GREAT MYSTERY. These last three actually boarded the GREAT MYSTERY. Two were armed with side arms and one with a shotgun. An automatic rifle was left with the coxswain on the small boat.

Upon boarding, the GREAT MYSTERY's crew were gathered in the stern section by the Coastguardsmen. The captain of the GREAT MYSTERY identified himself and upon request produced the ship's papers, which showed Florida registration of the vessel and ownership by a Grand Cayman corporation. Although kept under general surveillance by the Coastguardsmen, the crew of the GREAT MYSTERY were allowed to get their passports and birth certificates, which proved all of them to be citizens of the United States. Thereafter, while three of the Defendants remained in the fantail of the GREAT MYSTERY under the observation of the Coastguardsman with the shotgun, the petty officer, with Defendant Keller accompanying him, proceeded to inspect the vessel's safety equipment. While checking the forward bilges for oil, various bags bearing a "dog food" label were discovered in this compartment. A greenish substance could be observed through the plastic cover of the bags. A comment by the petty officer to the effect of "What have we here . . .", was answered by Defendant Keller, "What can I say . . ."

Defendant Keller was sent back with the rest of his crew. Upon further inspection, 10 to 15 sacks with dimensions of about 3′ × 2′ × 1′ were discovered. The petty officer reported to the POINT WARDE the possibility of contraband. He was asked to send a sample of the contents of the bags,

---

**2.** The home port appeared to have been painted over.

**3.** And also recorded. Thereafter by reason of a good faith administrative error the tape was

destroyed under circumstances which we find do not justify the imposition of sanctions against the Government. See *United States v. Picariello,* 568 F.2d 222 (C.A. 1, 1978).

which he proceeded to do. Upon arrival of the sample, a field test was performed aboard the POINT WARDE which proved positive to the presence of tetrahydrocannibinol, a compound occurring naturally only in the cannabis plant.

Immediately thereafter, which was about 45 minutes to one hour after they had first boarded, the boarding party received instructions to place Defendants under arrest, a procedure which they carried out in the stern section of the GREAT MYSTERY. Shortly after the arrest a *Miranda* warnings card was brought over from the POINT WARDE and read to Defendants, who acknowledged the same, and thereafter made no statements which can in any way be deemed incriminatory in nature.

With the exception of Defendant Keller, who agreed to remain on the GREAT MYSTERY to assist the prize crew with the navigation of this vessel to San Juan, the other Defendants were removed to the POINT WARDE. They were placed in the bow, but upon complaining of getting wet were removed to the after deck. There, the captain of the POINT WARDE read the *Miranda* warnings again. Their shackles were changed to allow them to put their hands in front and they were given wool blankets to cover themselves.

On the following day, that is on January 6, 1978, Defendants were fed breakfast and lunch, of the same substance as the crew of the POINT WARDE. They arrived at the Coast Guard Station in San Juan at 1530 hours and were taken into custody by United States Customs agents. They again were given *Miranda* warnings. Shortly thereafter they were taken before a United States Magistrate.

We now turn to the issues raised by the pending Motions.

### I. *Jurisdiction*

The jurisdictional questions are twofold. The first part of this issue deals with a

determination of whether a crime has been committed which is cognizable by this Court, i. e. within our subject matter jurisdiction. *Bowen v. Johnston*, 306 U.S. 19, 24, 59 S.Ct. 442, 83 L.Ed. 455 (1938). A separate question concerns whether Defendants are properly before the Court, i. e., whether there is personal jurisdiction to try Defendants.[4]

■ It has been consistently held that the power of a court to try a person for a crime is not impaired by the manner in which the person is brought within the court's physical control, *Kerr v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Strassheim v. Daily*, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1910); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *U. S. v. Cotten*, 471 F.2d 744, 747–749 (C.A. 9, 1973); *U. S. v. Quesada*, 512 F.2d 1043, 1045 (C.A. 5, 1975), cert. denied 423 U.S. 946, 96 S.Ct. 356, 46 L.Ed.2d 277 (1975); *U. S. v. Winter*, 509 F.2d 975, 985–989 (C.A. 5, 1975), at least where the Defendant is not before the Court as the result of outrageous conduct by government agents. See *United States v. Toscanino*, 500 F.2d 267 (C.A. 2, 1974), reh. denied 504 F.2d 1380 (C.A. 2, 1974). No such conduct is involved in this case and it is thus beyond any legal question that this Court has personal jurisdiction over Defendants.[5]

■ But the mere physical presence of Defendants before this Court, which has the effect of granting us personal jurisdiction, does not necessarily give us jurisdiction over the subject matter of the offense. Under international law a state does not have jurisdiction to enforce (i. e. exercise its power) a rule of law prescribed by it unless it has jurisdiction to prescribe the conduct in question. *Rivard v. U. S.*, 375 F.2d 882 (C.A. 5, 1967), cert. den. sub nom. *Groleau v. U. S.*, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d

---

**4.** We view the distinction between subject matter jurisdiction and personal jurisdiction as that between the appropriate exercise of power vis-a-vis physical control over a defendant. *Bowen v. Johnston, supra*, at p. 27, 59 S.Ct. 442.

*Strassheim v. Daily, supra*, 221 U.S., at p. 285, 31 S.Ct. 558.

**5.** The factual situation in *U. S. v. Winter, supra*, is particularly relevant.

181 (1967). The law of nations permits the exercise of criminal jurisdiction by a nation under five general principles: *territorial,* wherein jurisdiction is based on the place where the offense is committed; *national,* wherein jurisdiction is based on the nationality or national character of the offender;[6] *protective,* wherein jurisdiction is based on whether the national interest is injured; *universal,* which amounts to physical custody of the offender; and *passive personal,* wherein jurisdiction is based on the nationality or national character of the victim. See *Rivard v. U. S.,* supra; *U. S. v. Pizzarusso,* 388 F.2d 8, 10–11 (C.A. 2, 1968); cert. denied 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968).

Traditionally, the United States has relied primarily upon the territorial and nationality principles, and the courts have been reluctant to ascribe extraterritorial effect to penal statutes. Our courts have also developed what is referred to as the *objective territorial principle* as a means of expanding the power to control activities detrimental to the state (*U. S. v. Pizzarusso,* supra). This principle has been defined as including acts done outside a geographic jurisdiction, but which are intended to produce and producing detrimental effects within it. Those circumstances justify a state in punishing the cause of the harm as if it had been present at the effect. *Strassheim v. Daily,* supra, 221 U.S. at p. 285, 31 S.Ct. 558. This principle is distinct from the protective theory in that in the latter all the elements of the crime occur in the foreign country, and jurisdiction exists because these actions have a *potentially adverse* effect upon security or governmental functions, with no actual effect taking place in the country as would be required under the objective territorial principle.

Counts I and III of the indictment claim violations of laws of the United States which in our opinion Congress had authority to prescribe pursuant to the protective theory of criminal jurisdiction. As stated previously, Count I charges a conspiracy to import marihuana into the United States. The indictment claims overt acts within the United States, thus alleging a clear nexus to effects within this jurisdiction (*Rivard v. United States,* supra).[7] The planned invasion of the customs territory of the United States is sufficient basis for the invocation of jurisdiction under the protective theory, and the application of 21 U.S.C. 963 extraterritorially (*U. S. v. Pizzarusso,* supra). This is equally applicable to the charges in Count III dealing with attempted importation into the United States. See *U. S. v. Bowman,* 260 U.S. 94, 98–99, 43 S.Ct. 39, 67 L.Ed. 149 (1972); *United States v. Winter,* supra; *United States v. Vicars,* 467 F.2d 452, 456 (C.A. 5, 1972).

But there are additional basis for our validating the jurisdiction of the United States over the Defendants herein, and over the offenses charged in all three counts.[8]

Defendants claim that pursuant to 18 U.S.C. § 7, the special maritime jurisdiction of the United States does not extend to the GREAT MYSTERY, under the circumstances of this case. To evaluate Defendants' position we must carefully peruse this statute, which defines the special maritime jurisdiction of the United States as:

"(1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in

---

**6.** See *United States v. Black,* 291 F.Supp. 262, 266 (S.D.N.Y.1968); *United States v. Daniszewski,* 380 F.Supp. 113 (S.D.N.Y.1974).

**7.** In finding these alleged overt acts sufficient for jurisdictional purposes we note that for criminal purposes no such acts need be alleged under the conspiracy statute charged in the Indictment. *United States v. Cruz,* 568 F.2d 781 (C.A. 1, 1978); *United States v. De Jesus,* 520 F.2d 298 (C.A. 1, 1975), cert. denied, 423 U.S. 865, 96 S.Ct. 126, 46 L.Ed.2d 94 (1976);

*United States v. Thomas,* 567 F.2d 638 (C.A. 5, 1978).

**8.** Jurisdiction under Count II, which alleges possession with the intent to distribute, cannot rest on either the protective or objective territorial principles. It must rest on the nationality principle as expressed in 18 U.S.C. § 7, provided its requirements have been met. See n. 9 infra.

part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

"(2) Any vessel registered, licensed, or enrolled under the laws of the United States, and being on a voyage upon the waters of any of the Great Lakes, or any of the waters connecting them, or upon the Saint Lawrence River where the same constitutes the International Boundary Line."

It is Defendants' contention that since the GREAT MYSTERY is owned by a Grand Cayman corporation, Paragraph (1) of 18 U.S.C. § 7 is inapplicable, and that Paragraph (2) thereof is equally inapplicable because none of the waters mentioned therein are involved in this case. We agree with Defendants' position regarding Paragraph (2).

For purpose of this case we believe the key language in Paragraph (1) to be " . . . any vessel *belonging* in whole or in part to . . . any citizen . . . [of the United States]." We know of no case which interprets the term "belonging" within the framework of this legislation. Furthermore, the legislative history of this provision is sketchy. We will therefore accept this term in its common usage, which we take it to be as denoting ownership. Black's Law Dictionary, Fourth Ed., p. 198. Thus, if the GREAT MYSTERY was owned totally or partially by any citizen of the United States, the vessel is subject to the operation of 18 U.S.C. § 7(1).

Ownership is a mixed question of law and fact, and at this stage of the proceedings, to be determined by the Court. *Mullins v. U. S.,* 487 F.2d 581, 589 (C.A. 8, 1973); *U. S. v. Lewis,* 111 F. 630 (C.C.Tex., 1901).

Defendants' contentions regarding their allegations of non-United States ownership rests principally on the statement of ownership contained in the Florida boat registration certificate, to the effect that the vessel was owned by Caribbean Diversified Concepts, Ltd., a Grand Cayman corporation. The certificate of incorporation and by-laws, both printed standard forms, state the registered office of the Company as "O. L. Panton & Company" in Grand Cayman. The capital of the Company is stated as 190,000 shares at $1.00 par each. The subscribed stockholders are: O. L. Panton, Attorney-at-Law (one share); Heather Dilbert, accountant (one share); and Naomi Panton, Florist (one share). Several documents were presented dealing with the purchase of the GREAT MYSTERY by Caribbean Diversified Concepts, Ltd. Among these is a residency affidavit claiming exemption from Florida's State Sales Tax, which is signed by a "Purchaser Gerald Mergist" on behalf of Caribbean Diversified Concepts, Ltd. The bill of sale is only signed by a "Walter M. Tranger", an official of the Palm Beach Atlantic College, the seller. A "Robert G. Sbill" signs as witness. Interestingly enough, no minutes of the corporation were presented indicating approval of the purchase by the corporation or indicating formal acceptance of this asset.

In juxtaposition to these highly suspicious indicia of Grand Caymanian ownership we have: Florida registration of the vessel; the prominent showing of the Florida registration numbers; the presence of the flag of the United States in the wheel house, although no flag was flown when intercepted; statements by the crew that it was a United States vessel headed for the United States; and the United States nationality of the entire crew.

In our opinion the ownership of this vessel is not as great a mystery as Defendants would have us believe. There is sufficient credible circumstantial evidence from which to find that the GREAT MYSTERY belongs in whole or in part to citizens of the United States, and we so hold. *St. Clair v. U. S.,* 154 U.S. 134, 14 S.Ct. 1002, 38 L.Ed. 936 (1894); *United States v. Ross,* 439 F.2d 1355 (C.A. 9, 1971) cert. denied 404 U.S. 1015, 92 S.Ct. 686, 30 L.Ed.2d 661 (1972); *U. S. v. Peterson,* 27 Fed.Case No. 16037, p.

515, 518 (C.C.Mass., 1846); Baer, *Admiralty Law of the Supreme Court* (The Michie Co., 2nd Ed.), p. 518–519.[9]

We therefore rule that the GREAT MYSTERY was a vessel subject to the special maritime jurisdiction of the United States within the meaning of 18 U.S.C. § 7.

In view of the above, Defendants' Motion to Dismiss for lack of jurisdiction is DENIED.

II. *The Search and Seizure :*

The validity of the boarding, search and seizure of the GREAT MYSTERY is a totally independent issue from our determination of jurisdiction.

The authority to board, search and seize the GREAT MYSTERY is clearly granted to the Coast Guard by virtue of 14 U.S.C. § 89(a). This statute reads as follows:

"(a) The Coast Guard may make inquiries examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant and petty officers may at any time go on board of any vessel subject to the jurisdiction, or go to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested . . , or other lawful and appropriate action shall be taken; or if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, . . . , such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized."

Thus, the Coast Guard may board any vessel *subject to the jurisdiction, or to the operation of any law,* of the United States.

Irrespective of the nationality of the owners of the GREAT MYSTERY it is an undisputed fact that the GREAT MYSTERY was registered in Florida. By virtue of this fact alone it is subject to the jurisdiction of the United States and to the following laws of the United States:

(1) It is a "vessel of the United States" (16 U.S.C. § 1802(2)), subject to the provisions of the Fishery Conservation and Management Act of 1976 (90 Stat. 331) which establishes a fishery conservation zone of 200 nautical miles (16 U.S.C. § 1811),

(2) It is an "undocumented vessel" (46 U.S.C. § 1452(3)), used on waters subject to the jurisdiction of the United States (46 U.S.C. § 1453(a)) and thus subject to the provisions of the National Boat Safety Act of 1971, as amended (85 Stat. 220, 90 Stat. 2490),[10]

---

9. As regards the Second Count of the Indictment, jurisdiction could also be grounded upon what has been termed the "law of the flag", which supersedes the territorial principle for purposes of criminal jurisdiction. *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). Under this principle, a vessel is deemed to be a part of the territory of the sovereignty whose flag it flies. *United States v. Flores,* 289 U.S. 137, 155–157, 53 S.Ct. 580, 77 L.Ed. 1086 (1933); also see: *Maul v. United States,* 274 U.S. 501, 511, 47 S.Ct. 735, 71 L.Ed. 1171 (1927); *Cunard S. S. Co. v. Mellon,* 262 U.S. 100, 129, 43 S.Ct. 504, 67 L.Ed. 894 (1923).

Although the GREAT MYSTERY was not flying any flag when it was sighted and eventually boarded by the Coast Guard, the above-summarized indicia tends to point out that it was the American flag, and no other, which this vessel was "entitled to fly." See Article 5 of the U.N. Convention on the High Seas of 1958, 13 *U.S. Treaties and Other International Agreements,* pp. 2312–2321 (1962).

10. As an undocumented vessel, the GREAT MYSTERY was required to be numbered by "the State in which the vessel is principally used." 46 U.S.C. § 1466. This is a Federal function which has been delegated to States

(3) It is a "vessel of the United States" within the meaning of the Ship Registry and Recording Act of 1946, as amended (60 Stat. 1097, 74 Stat. 421), and required to have a "home port" subject to the approval of the Commissioner of Customs (46 U.S.C. § 18),

(4) It is a "vessel of the United States" (22 U.S.C. § 1971) within the protection of the Fishermen's Protective Act of 1967 as amended (68 Stat. 883, 90 Stat. 360),

(5) It is an "American vessel" (29 U.S.C. § 203(p)), subject to the provisions of the Fair Labor Standards Act, as amended (52 Stat. 1060, etc.),

(6) It is a "vessel of the United States" (19 U.S.C. § 1703(b) and a "hovering vessel" (19 U.S.C. § 1709(d)), subject to the application of the Anti-Smuggling Act of 1935 (49 Stat. 529),

(7) It is an "American vessel" (18 U.S.C. § 1081) subject to the provisions of the Anti-Gambling Act of 1949, as amended (63 Stat. 92, 75 Stat. 491), and

(8) It is an "American vessel" (26 U.S.C. § 3121(f)) within the coverage of the Insurance Contributions Act, as amended (68A Stat. 417).

This list is by no means exhaustive.[11]

Defendants nevertheless challenge the Coast Guard's actions claiming that a warrant was required for the boarding and search, because "no Act of Congress can authorize a violation of the Constitution." (*Almeida v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1972)), a statement which cannot be quarreled with, but which we consider misapplied to the circumstances of this case.

As with the rest of the Constitution, no real understanding of the Fourth Amendment[12] is possible without reference to the historical background under which it was framed.[13] See *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Standford v. Texas,* 379 U.S. 476, 481–485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); *Marcus v. Search Warrant,* 367 U.S. 717, 724–729, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); *Frank v. Maryland,* 359 U.S. 360, 363–365, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959).[14] In *Warden v.*

such as Florida. 46 U.S.C. § 1467(a); Senate Rep. No. 92–248, 92nd Cong. 1st Sess., reprinted in [1971] 2 U.S.Code Cong. & Ad.News, p. 1333; 14 Fla.Stat.Ann. § 371.091; 33 C.F.R. Part 173, Appendix A (1975).

**11.** Even assuming, *arguendo,* that this is a British colony's vessel, it is interesting to refer to the U. N. Multilateral Single Convention on Narcotic Drugs of 1961, 18 *U. S. Treaties and Other International Agreements,* pp. 1407–1431 (1967). Article 37 of this Convention, in which both the United States and Great Britain appear as signatories, provides:

"Any drugs, substances and equipment used in or intended for the commission of any of the offenses, referred to in article 36, shall be liable to seizure and confiscation."

The Coast Guard is the primary maritime agency charged with the enforcement of federal law at sea, 14 U.S.C. § 2, and a treaty, when entered into by the United States becomes, for all purposes, a federal law. *Dreyfus v. Von Finck,* 534 F.2d 24 (C.A. 2, 1976). Thus, it could be argued that even a British Crown colony's vessel would not be entirely shielded from Coast Guard's authority under certain circumstances. See, generally: *Ford v. United States,* 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927); Brafman & Blanstein, *Constitutions of Dependencies and Special Sovereignties (Cayman Islands),* Oceana Publications, July 1975; "An American

Lawyer Looks at the Caymanian Companies Law", 31 Bus.Law 1619 (April, 1976).

**12.** Amendment IV: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

**13.** See generally Carmichael, "At Sea With The Fourth Amendment", 32 U. of Miami L.Rev. 51, 76–81 (1977).

**14.** In *Frank v. Maryland, supra,* a Baltimore health inspector was refused entry into Defendant's home because he did not have a search warrant. The inspector was seeking the source of a rat infestation and sought entry pursuant to a Maryland statute, which allowed entry when cause existed to suspect that a nuisance was present. The Supreme Court upheld Defendant's conviction for refusing entry and stated (at 359 U.S. 367–368, 79 S.Ct. at 809):

"Inspection without a warrant, as an adjunct to a regulatory scheme for the general welfare of the community and not as a means of enforcing the criminal law, has antecedents deep in our history. For more than 200

*Hayden,* supra, the Supreme Court summarized this background, as follows:

" . . . [The Fourth Amendment] was a reaction to the evils of the use of the general warrant in England and the writs of assistance in the Colonies, and was intended to protect against invasion of 'the sanctity of a man's home and the privacies of life' . . . from searches under indiscriminate general authority . . . ." (387 U.S. at page 301, 87 S.Ct. at page 1647).

In this context, it should be noted that this amendment denounces only such searches and seizures as are *unreasonable. Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1921).

What is reasonable depends on the circumstances of each case. *Chambers v. Maroney,* 399 U.S. 42, 51–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1969); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). The Supreme Court in the *Carroll* case noted " . . . a necessary difference between a search of a store, dwelling house, or other structure . . . , and a search of a ship . . . " (267 U.S. at 153, 45 S.Ct. at 285). See also *Chambers v. Maroney,* supra, 399 U.S. at page 48, 90 S.Ct. 1975. Although there still seems to be a

requirement that cause exist to search a ship (*United States v. ·Lee,* 274 U.S. 559, 562, 47 S.Ct. 746, 71 L.Ed. 1202 (1926)),[15] we believe that in its modern context the standard to be applied is closely akin to the situation presented by a boarder search, wherein the prevailing test is the existence of articulable facts giving the authorities a reasonable or individualized suspicion that the law is being violated. *United States v. Martínez-Fuerte,* 428 U.S. 543, 560–562, 96 S.Ct. 3074, 49 L.Ed. 1116 (1975); *United States v. Brignoni-Ponce,* 422 U.S. 873, 884–885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1974); cf. *United States v. Kallevig,* 534 F.2d 411 (C.A. 1, 1976). See also *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed. 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The facts presented by this case live up to this test. This is so particularly if we consider them in the light of the powers historically granted to the Coast Guard,[16] whereby the expectations of privacy from boarding and inspection while on the high seas, of a vessel registered in the United States, must be considered limited.[17] *United States v. Martínez-Fuerte,* supra; *United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1971); *United States v. Moore,* 562 F.2d 106, 111–112 (C.A. 1, 1977);[18] *United States v. Odneal,* 565 F.2d

years Maryland has empowered its officers to enter upon *ships,* carriages, shops, and homes in the service of the common welfare. In pre-revolutionary days trade, on which the viability of the struggling Colonies depended, was of primary concern. Thus, at a time when the tobacco trade was a vital part of Maryland's economy, inspection of *ships* and carriages without a warrant could be made to enforce uniform standards for packaging and shipping tobacco. Similarly, suspected evasion of import duties on liquor and other goods could be found out by inspection of stores and homes. Generally the power of entry was carefully limited, requiring that ground for suspicion must exist and that the inspection be conducted between 'the rising and the setting of the sun.' " (emphasis supplied).

15. *Cf. United States v. One (1) 43 Foot Sailing Vessel,* 405 F.Supp. 879, 883 (S.D.Fla., 1975), aff'd 538 F.2d 694 (C.A. 5, 1976).

16. Act of August 4, 1790, c. 35, 1 Stat. 145. Section 48 thereof authorizes entry aboard "any ship or vessel in which they shall have reason to suspect" is carrying contraband. In the case of a dwelling house, store, building or other place a warrant is necessary. See also "At Sea With The Fourth Amendment", supra, pp. 65–75.

17. "From the moment when a new vessel becomes so much as a thoughtful expression . . . during and after construction . . . and throughout the life of the vessel", it is the normal course of events that it be subjected to "periodic and unscheduled inspections (especially by the Coast Guard) . . . " Gilmore and Black, *The Law of Admiralty,* § 11–12, p. 986–987, 2nd Ed. 1975.

18. Holding that "the lessened expectancy of privacy associated with motor vehicles justifies the use of beepers without a warrant to track vehicles", where law enforcement officers have probable cause at the time (562 F.2d at pages 112–113).

598 (C.A. 9, 1977); *United States v. Hillstrom*, 533 F.2d 209 (C.A. 5, 1976), cert. denied 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1976); *United States v. Odom*, 526 F.2d 339 (C.A. 5, 1976); *United States v. Hickman*, 523 F.2d 323 (C.A. 9, 1975), cert. denied 423 U.S. 1050, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976).

■ The facts to which we refer can withstand repetition at this time: the presence of a vessel suspected [19] of engaging in violation of United States laws hovering in the vicinity of United States territorial waters, while not flying any flag [20] although registered in Florida, with its home port painted over in its stern,[21] and proceeding from the Northern coast of South America.

Furthermore, as stated in *United States v. One (1) 43 Foot Sailing Vessel, supra* (at 405 F.Supp., page 883):

> " . . . The direct and special interest of the United States in the safety and administrative control of vessels operating under the protection of its flag and authority of its documents may be analogized to the traditionally high government interest in liquor or firearms dealers which have historically justified administrative measures such as limited warrantless inspections or searches . . . " [22]

See also *United States v. Biswell, supra; Frank v. Maryland, supra.*

Nor can a prior suspicion of the presence of drugs aboard the GREAT MYSTERY taint the validity of a boarding and inspection in the light of the Coast Guard's responsibilities under 14 U.S.C. § 89(a). *United States v. Hillstrom, supra,* at page 211. As the Ninth Circuit expressed in *United States v. Hickman, supra:*

> "An officer making an investigatory stop will often have some suspicion of the identity of the person apprehended and of his prior unobserved activity. It is the very purpose of the investigatory stop to allow the officer to confirm or deny these suspicions by reasonable questioning, rather than forcing in each instance the 'all or nothing' choice between arrest and inaction." Id. at 327; also see, *United States v. Gaines,* 563 F.2d 1352 (9th Cir., 1977).

In view of the above, no elaboration is needed for the proposition that contraband which, as here, is in the "plain view" of an officer who is where he has the right to be, may be seized and is the basis for a valid arrest. *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *U. S. v. Hillstrom, supra.*

The Motion to Suppress the contraband seized is therefore DENIED.

### III. *Miranda Warnings:*

Defendants contend that they were immediately placed under arrest upon the Coast Guard's boarding of the GREAT MYSTERY and that *Miranda* warnings were not timely given. The suppression of the contraband and of all statements leading to its discovery is requested on this ground. We reject these contentions.

---

**19.** Cf. *Adams v. Williams, supra; United States v. Kallevig, supra.*

**20.** See Baer, *Admiralty Law of the Supreme Court, supra,* at page 519, footnote 1.

**21.** Cf. 46 U.S.C. §§ 46, 47; 46 C.F.R. 67.13–1; Cf. *United States v. Hickman, supra.*

**22.** As stated this seems to stand for the proposition that any U. S. vessel can be stopped and boarded by the Coast Guard under any circumstance, irrespective of probable cause. We rely on this language only to the extent applicable to the circumstances of this case.

*United States v. Warren,* 550 F.2d 219 (5th Cir., 1977), cited by Defendants herein, although not supportive of the views sustained by them, is a *caveat* to Coast Guard actions pursuant to 14 U.S.C. § 89(a). There the Fifth Circuit held valid the initial boarding for safety inspection purposes, but invalidated evidence discovered as a result of interrogation and search conducted by Drug Enforcement and Customs Agents, who accompanied the Coast Guard, because the Coast Guard was not authorized to delegate its authority to stop and search vessels and because under the circumstances of that case, the interrogation and search went beyond the scope of a safety inspection.

Under *Miranda v. Arizona, supra,* the necessity of warning a suspect of his federal constitutional rights arises when a "custodial interrogation" begins. The Supreme Court opined in *Miranda* that a custodial interrogation is so laden with the possibility of coercion that statements made during such an interrogation are to be considered compelled, unless the defendant is informed of his rights. Custodial interrogation of suspects was defined as the questioning of a suspect or an accused, initiated "[while the defendant is in] custody or otherwise deprived of his freedom of action in any significant way." Id., 384 U.S. at 444–445, 86 S.Ct. at 1612; see: *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).

The number of cases discussing what constitutes "custodial interrogation" within the *Miranda* rule is enormous.[23] It has been decided that there is no custodial interrogation when a police officer stops a person and asks him for his name, address and explanation of his activities under the Stop and Frisk Law. *Terry v. Ohio, supra.* Also, routine inquiries into the ownership of a stopped vehicle, the identity of its driver or occupants, and other such matters by law enforcement personnel do not constitute custodial interrogation. See *United States v. Jones,* 543 F.2d 1171, 1173 (C.A. 5, 1976), and cases cited therein. Also see: *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *United States v. Hatchel,* 329 F.Supp. 113 (D.C.Mass.1971)[24]. Even investigatory quests by law enforcement officials, taking place inside houses or rooms, have been characterized as a noncustodial under certain circumstances. See,

*Menéndez v. United States,* 393 F.2d 312 (C.A. 5, 1968), cert. den. 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 572; *United States v. Littlepage,* 435 F.2d 498 (C.A. 5, 1970), cert. den. 402 U.S. 915, 91 S.Ct. 1374, 28 L.Ed.2d 657, reh. den. 402 U.S. 1013, 91 S.Ct. 2187, 29 L.Ed.2d 436; *Hon. Keung Kung v. District Director, Immigration and Naturalization Service,* 356 F.Supp. 571 (D.C.Mo., 1973); cf. *United States v. Carollo,* 507 F.2d 50 (C.A. 5, 1975), cert. den. 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105.

█ When the circumstances of this case are evaluated against the backdrop of these general principles, it is clear to us that the requirements of *Miranda* and its progeny have not been transgressed.

The reasonable inspection of a vessel by the Coast Guard could be analogized with the type of investigative stop termed reasonable in *Terry v. Ohio, supra,* and it could be compared with the general on-the-scene questioning which the *Miranda* court had distinguished from in-custody interrogation. It is true that the boarding party in this case was displaying weapons and that the crew was gathered by the Coastguardsmen in the stern section of the vessel upon boarding. But the circumstances of this boarding justified the boarding party to adopt reasonable measures to ensure its safety, with due regard to the rights of the crew of the boarded vessel.[25] Furthermore there is nothing indicating that there was any inquisitorial questioning prior to the warnings, or that the boarding officers purported to arrest Defendants at that time.[26]

The Coastguardsmen's inquiries to the Captain and crew of the GREAT MYS-

---

**23.** For an exhaustive survey of these decisions, see: 31 A.L.R.3d 565.

**24.** In consonance with these principles, it has been held that border patrol officers were not required to give *Miranda* warnings before they could request suspects to open the trunk of an automobile. *United States v. Moffett,* 522 F.2d 1379 (5th Cir., 1975).

**25.** In this connection, it is the Court's view that the factors surrounding the Coast Guard's boarding and inspection of a vessel on the high seas, at night, should not be blindly measured

against standards which are operative in less exigent circumstances. Cf. *Commonwealth of Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

**26.** This case simply does not present the intensive and continuous interrogation rejected in *Warren, supra.* Although it could be said that Defendants' freedom of movement was not insubstantially curtailed, see note 25 supra, there was simply no questioning designed specifically to yield incriminating statements. *Warren, supra,* at 226.

TERY dealt merely with the ship's documents, the nationality of the crew and the required safety devices. None of the assertedly "custodial" questions were directed to the offense which was later uncovered. See: *Chavez-Martinez v. United States,* 407 F.2d 535 (C.A. 9, 1969). Rather, the initial "questioning" did not go beyond the limits of an investigatory boarding. *Hickman, supra.* These were routine inquiries within the bounds of the Coast Guard's statutory faculties which, absent other relevant factors, do not necessitate *Miranda* warnings before there is indicia of the commission of a crime.[27] Cf. *United States v. Golden,* 532 F.2d 1244 (C.A. 9, 1976) cert. denied *sub nom. Trowery v. United States,* 429 U.S. 839, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976); *United States v. Oneal, supra.*

Of greater importance, except for Defendant Keller's exclamation to the petty officer when the latter observed suspicious material in one of the vessel's compartments, there were simply no incriminatory statements by any of the Defendants. Clearly, the situation in this case cannot be characterized as one where "the behaviour of . . . law enforcement officials was such as to overbear [Defendants'] will to resist and bring about confessions not freely self-determined . . ." *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).[28]

As regards the aforesaid utterance by Defendant Keller, we find that the same was volunteered and spontaneous and not the result of custodial interrogation. Cf. *Diaz v. United States,* 264 F.Supp. 937 (D.C. La., 1967), aff'd 391 F.2d 932 (C.A. 5, 1968). The petty officer's comment was proffered contemporaneously with his discovery of the plastic bags inside the forward bilges of the vessel. That was the earliest moment which could arguably constitute commencement of custody for purposes of determining the timeliness of the warnings. *Fisher v. Scafati,* 439 F.2d 307 (1st Cir. 1971), cert. denied 403 U.S. 939, 91 S.Ct. 2256, 29 L.Ed.2d 719 (1971). Thereafter, no incriminatory statements were elicited before the giving of the *Miranda* warnings.

WHEREFORE, in view of the foregoing, the *Miranda* -based request for suppression is hereby DENIED.

IT IS SO ORDERED.

---

**27.** At the time of boarding and initial questioning, the Coastguardsmen, although not devoid of any type of suspicion, did not have sufficient grounds to arrest the Defendants. This tends to detract from their argument that they were in custody since the incipient stages of the process. See *United States v. Manni,* 270 F.Supp. 103 (D.C.Mass.1967), aff'd 391 F.2d 922 (C.A. 1, 1968), cert. denied 393 U.S. 873, 89 S.Ct. 166, 21 L.Ed. 143 (1968).

**28.** Any statement made by Defendant Pettit to Defendant Scott does not appear to have been heard by the Coastguardsmen, and in any event, does not seem to have been induced by coercion, fraud or misrepresentation. Cf. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Payne v. United States,* 409 F.2d 1350 (C.A. 5, 1969); *White v. United States,* 395 F.2d 170 (C.A. 8, 1968), cert. denied *sub nom. Kubik v. United States,* 393 U.S. 844, 89 S.Ct. 127, 21 L.Ed.2d 115 (1968).