**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Cacimar ZENON–ENCARNACION,**
**Pedro Zenon–Encarnacion,**
**Defendants.**

**Crim.No. 00–155 (DRD).**

United States District Court,
D. Puerto Rico.

Dec. 28, 2001.

Harry Anduze-Montano, San Juan, PR, for defendant.

## AMENDED OPINION AND ORDER

DOMINGUEZ, District Judge.

Pending before the Court is Defendants' Memorandum of Law for the Acquittal of Defendants Because of Reasonable Doubt and Lack of Jurisdiction (Docket No. 73). The Government also filed a Trial Memorandum on the issue of whether this Court has jurisdiction to entertain this case. (Docket No. 68). Further, the Court examines a Rule 29 motion verbally made by Defendants at trial, and supported in its Memorandum of Law, reviewing the evidence "in the light most amiable to the government, and taking all reasonable inferences in its favor, [so that] a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully prove[s] the essential elements of the crime." *United States v. Hernandez,* 146 F.3d 30, 32 (1st Cir.1998); *see also United States v. O'Brien,* 14 F.3d 703, 706 (1st Cir.1994).

The request for acquittal under reasonable doubt is, of course, not examined in the light most favorable to the government. The Court reserves judgment on acquittal based on reasonable doubt for final arguments to be made in open court, later on this same date. Nonetheless, for the reasons that follow, the Court hereby **DENIES** Defendants' Rule 29 request and preserves its jurisdiction in this case.

### I

### FACTUAL BACKGROUND

On March 18, 2000, a United States Navy Land Craft Utility Vessel (LCU–1676) departed from Roosevelt Rads Naval

Station (Roosevelt Roads) on the eastern coast of Puerto Rico to deliver equipment and supplies to a military operation post located at Jalova Beach, on the southeastern side of the Island of Vieques. On board the vessel was a crew composed of mostly civilian personnel. In any case, it is undisputed that the civilian personnel on board were employees of Seaward Services, Inc. The vessel arrived at the corresponding bay at approximately 2:00 PM.[1] Upon entering the bay, a small fishing boat began approaching the vessel. On board the fishing boat were the Defendants.

The Defendants began shouting profanities at the crew members on board the military vessel in Spanish. They also made obscene gestures (raising the index, that is the middle, finger of their right hands) towards the crew members on board the vessel. Much to the LCU–1676 crew's surprise, one of the Defendants (the passenger) began throwing rocks at them. Moreover, as the LCU–1676 approached the beach were it was going to unload military equipment, the Defendants steered their boat directly in front of the vessel with the apparent intention of interfering with the planned discharge. Eventually, the Defendants moved aside and the military vessel was able to approach the beach and unload. The Defendants then positioned their boat besides the military vessel, equally close to the shore.

Nevertheless, while the LCU–1676 was unloading the equipment unto the shore, both Defendants, from their boat, began throwing rocks at the military personnel that was on land securing the delivery of equipment and supplies. They threw approximately eight (8) rocks at the men on

land. The Defendants then took aim at the military vessel and crew members.

After the LCU–1676 unloaded the equipment and supplies on Jalova Beach, it once again departed towards Roosevelt Roads. The Defendants also took off towards the sea at a faster speed than the LCU–1676 and separating itself considerably from the military vessel, but then, they seemed to position themselves at the Bay's exit. When the military vessel began approaching that part of the Bay, the Defendants once again steered close to the LCU–1676 and began throwing rocks. Some rocks fell short, in the water; others hit the military vessel; one rock hit Manuel Roman–Serrano causing him a hematoma in the torso. The Defendants then repeated some of the obscenities they had proffered before (an obscenity was then stated from the LCU–1676), and eventually the vessels departed in separate directions, all the while the Defendants were displaying their middle fingers—a gesture that is hardly an international symbol of friendship. Defendants threw approximately 21 rocks in total.

Warrants for the arrest of the Defendants were eventually issued, on April 17, 2000. After following proper procedure, they were charged with simple assault, that is, with aiding and abetting each other in forcibly assaulting, resisting, opposing, impeding, intimidating and interfering with Manuel Roman–Serrano, while he was assisting naval personnel engaged in the performance of their official duties on board a United States military vessel, as defined by law, all in violation of 18 U.S.C. §§ 2 & 111(a)(1). (See Docket No. 17). Then on August 9, 2001, the Government filed a Superseding Information charging

---

**1.** The facts in this case, as to what occurred in and about Jalova Bay on that date are based on the video tape recording admitted into evidence. *See* Government Exhibit No. 13.

the Defendants with violating 18 U.S.C. §§ 2 & 113(a)(4). (See Docket No. 56).

## II

## CRIMINAL MARITIME JURISDICTION IN PUERTO RICO

The issue squarely before the Court today is whether federal criminal jurisdiction can be exercised in this case. The legal issue would have proved simple if the facts would have occurred in any other jurisdiction of the United States. But provided Puerto Rico's somewhat distinct relationship with the United States, and the peculiarity of maritime law in this jurisdiction, the inquiry becomes more intricate. After careful consideration, the Court finds that criminal jurisdiction must be maintained in this case.

■ Through Sections 8 and 37 of the Puerto Rico Federal Relations Act, Congress conferred control to the Commonwealth of Puerto Rico over its local, navigable waters. Said power included the ability to enact inconsistent legislation with the Jones Act and the General Maritime law of the United States. Accordingly, the rules of the admiralty and maritime law of the United States apply to Puerto Rico's navigable waters, **but only to the extent that they are not locally inapplicable,** because they were not designed to apply to Puerto Rico waters, or because they have been rendered inapplicable by reason of being inconsistent with Puerto Rican legislation. *See Guerrido v. Alcoa Steamship Co.,* 234 F.2d 349, 355 (1st Cir.1956).

■ Since Congress gave the Legislature of Puerto Rico full power to provide compensation for marine workers injured in Puerto Rican waters to the exclusion of the remedies against their employers provided by the American maritime law, Puerto Rico did just that. Puerto Rico has exercised the power delegated by Congress and has enacted legislation inconsistent with the Jones Act and the General Maritime Law of the Unites States insofar as the Workmen's Accident Compensation Act of Puerto Rico, Apr. 18, 1935, No. 45 p. 250, 11 P.R. STAT. ANN. § 1 et al. (1997) (PRWACA), grants absolute employer immunity for accidents of seamen occurring within the territorial navigable waters of Puerto Rico. *See Guerrido,* 234 F.2d at 355. Accordingly, unlike anywhere else in the United States, in Puerto Rico, when a seaman, who is a resident of Puerto Rico, is injured within the territorial waters of Puerto Rico while working for a company insured under the PRWACA, the only remedy available is the one provided by local law—the PRWACA. *See Lusson v. Carter,* 704 F.2d 646, 649 (1st Cir.1983)(holding that because of the power Congress delegated to Puerto Rico in § 749, PRWACA displaces the Jones Act as the **exclusive** remedy for covered seamen injured by insured employers in Puerto Rican waters).

Within this framework in mind, the first relevant question is whether the acts charged against Defendants occurred in Puerto Rico waters. The second question is whether the Commonwealth of Puerto Rico has exclusive jurisdiction. The third relevant question is whether Congress has given Puerto Rico the power to supplant federal law with respect to criminal acts. The critical inquiry is whether the waters where the acts charged against Defendants are part of the special criminal maritime jurisdiction of the United States, within the applicable criminal statute, *i.e.,* 18 U.S.C. § 7(1).

**A. The acts charged against Defendants occurred in Puerto Rico waters.**

■ In 1980 Congress amended Puerto Rico's Second Organic Act, as to the scope

of Puerto Rico's local waters. Specifically, 48 U.S.C. § 749 is the statute that confers local maritime jurisdiction on the Commonwealth of Puerto Rico. Through the amendment, Congress extended Puerto Rico's maritime jurisdiction to the navigable waters within three marine leagues of the Island's coastline. Prior to 1980, § 749 provided in relevant part that:

The harbor areas and navigable streams and bodies of water and submerged lands underlying the same in and around the island of Puerto Rico and the adjacent islands and waters, owned by the United States on March 2, 1917, and not reserved by the United States for public purposes, are placed under the control of the government of Puerto Rico.

Notwithstanding, the statute was silent on the exact of the "navigable bodies of water" to which Puerto Rico was given "control". However, the 1980 amendment to § 749 added, inter alia, a definition of "navigable bodies of water," to wit:

(2) "navigable bodies of water and submerged lands underlying the same in and around the island of Puerto Rico and the adjacent islands and waters" extend from the coastline of Puerto Rico and the adjacent islands as heretofore or hereafter modified by accretion, erosion, or reliction, **seaward to a distance of three marine leagues;**

§ 749 (emphasis added). It is clear then, that Congress conferred power to the Commonwealth of Puerto Rico to enact inconsistent legislation with the General Maritime law of the United States with respect to **a seaward distance of three marine leagues, but only to the extent that it is not locally inapplicable.** *Guerrido*, 234 F.2d at 355.

Congress' major purpose in amending § 749 was to give Puerto Rico the same rights to undersea minerals as certain costal states were given by the Submerged Lands Act, 43 U.S.C. § 1301 (1953). *See Perez de la Cruz v. Crowley Towing and Transportation Company*, 807 F.2d 1084, 1088 (1st Cir.1986). Notwithstanding that most (costal) states' property rights to the submerged lands were limited to three geographical miles from their coasts, in *United States v. Louisiana*, 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960), the Supreme Court ruled that the Submerged Lands Act entitled Texas and Florida, as against the United States, to the submerged lands underlying the Gulf of Mexico, to a distance of **three marine leagues** from their coastline seaward into the Gulf of Mexico. Three marine leagues is a considerable amount of land because it constitutes nine marine, nautical, or geographical miles, or approximately 10½ land, statute or English miles. *See* 363 U.S. at 9 note 6, 80 S.Ct. 961.

The Court's holding in that case is significantly pertinent to the case at bar provided the historical foundations that lead it to find that, unlike other coastal states, Texas and Florida had a statutory right to control the submerged lands in the Gulf of Mexico that extend from its coast seaward to three marine leagues. It is important to bear in mind that these two states were once Spanish colonies, where European maritime law prevailed. "The admission of Texas and the readmission of Florida to the Union—the Supreme Court held were repeatedly asserted as instances where Congress had made exceptions to the three-mile policy, purportedly based on the shallowness of waters in the Gulf **and the alleged Spanish custom of claiming three leagues of territorial waters.**" 363 U.S. at 32, 80 S.Ct. 961 (emphasis added).[2]

---

**2.** It is also important to note, moreover, that

notwithstanding the recognition of the coastal

Hence, in amending § 749, Congress gave Puerto Rico the same rights over its coastal waters (i.e., three marine leagues) as those that were recognized for Texas and Florida by the Supreme Court in *Louisiana, supra,* in clear recognition that Puerto Rico's maritime law also had its roots in Spanish custom. *See* S.Rep. 467, 96th Cong., 1st Sess. 22 (1979); *see generally Perez de la Cruz,* 807 F.2d at 1088.

In the instant case, the misdemeanor the Defendants are charged of committing undoubtedly occurred within three marine leagues. The coastal area known as Jelova Bay, Vieques, is well within the parameters of Puerto Rico's jurisdiction under § 749. See Defendants' Exhibit A. Therefore, the charged assault committed by Defendants occurred within the waters of Puerto Rico.

**B.  The Commonwealth of Puerto Rico and the United States share concurrent criminal jurisdiction over the local waters of Puerto Rico.**

■  As explained above, Congress has conferred control to the Commonwealth of Puerto Rico over its local, navigable waters. Accordingly, Puerto Rico has the ability to enact legislation that is inconsistent with the Jones Act and the General Maritime law of the United States. *See Guerrido,* 234 F.2d at 355. · Puerto Rico also has also made its criminal laws enforceable against persons that commit or attempt to commit criminal offenses "[i]n the territorial extension of the Common-

wealth of Puerto Rico[.]" 33 P.R. STAT. ANN. § 3002 (1983).  Moreover, [i]t is "understood by territorial extension the land, **sea** and air space **subject to the jurisdiction of the Commonwealth of Puerto Rico."** 33 P.R. STAT. ANN. § 3003 (1983)(emphasis added).  However, an important caveat is in place at this point of the Court's analysis.  In *Alcoa Steamship Company v. Velez,* 376 F.2d 521 (1st Cir.1967) the First Circuit cautioned that although Puerto Rico has power to legislate inconsistently, this rule

**was not intended to mean that the Congress had delegated to the Legislature of Puerto Rico power in the general field of admiralty and maritime law.... Indeed, the delegation of such power would radically change the characteristic feature of the general maritime law that it follows the flag of the vessel and would seriously interfere with the proper uniform application of that law in its international and interstate relations.**

*Id.* (emphasis added).[3]  Furthermore, the rules of the admiralty and maritime law of the United States **apply to Puerto Rico's navigable waters,** except when they were not designed to apply to Puerto Rico waters, or because they have been rendered inapplicable by reason of being inconsistent with Puerto Rican legislation.  *Guerrido,* 234 F.2d at 355.  Since Puerto Rican legislation has not, as a matter of fact, displaced the criminal maritime laws of the United States;  and since these federal

---

states' control over the submerged lands, section 6(a) of the Act specifically reserved to the United States all "its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense. and international affairs ..." among others.

**3.**  In *Velez* the Court specifically held that the PRWACA cannot be applied to seamen injured in Puerto Rican waters on an American vessel owned by a corporation of a state other than Puerto Rico where the contract of employment was not entered into in Puerto Rico. 376 F.2d at 525.  Hence, the traditional U.S. maritime jurisdiction lies in Puerto Rico waters.

criminal laws have been specifically designed to apply to Puerto Rico; but more importantly, since **Congress has not delegated to the Legislature of Puerto Rico power in the general field of admiralty and maritime law,** it follows then that the criminal maritime laws of the United States are applicable even in Puerto Rico waters. As such, **the general maritime law of this Nation states that it follows the flag of the vessel.** Congress has not given Puerto Rico the power to supplant federal law with respect to criminal acts committed in Puerto Rico's waters. And because Puerto Rico is a Territory of the United States, subject to the Constitution, the Court harbors serious doubts that such power can ever be granted.

Finally, albeit in general terms, § 749 addresses the issue before the Court today, and saves the power of the United States to apply and enforce its laws even in the waters of Puerto Rico:

> [a]ll laws of the United States for the protection and improvement of the navigable waters of the United States and **the preservation of the interest of navigation** and commerce, except so far as the same may be locally inapplicable, **shall apply to said island and waters as to its adjacent islands and waters.**

*Id.* (emphasis added).[4] Undoubtedly, the phrase "preservation of the interest of navigation" should be interpreted in ample terms, and made applicable to the case at bar.

■ Accordingly, the Court finds that the Commonwealth of Puerto Rico and the United States share concurrent criminal jurisdiction over the local waters of Puerto Rico. *See Murray v. Hildreth,* 61 F.2d 483 (5th Cir.1932) (holding *inter alia* that Congress has taken jurisdiction of crimes committed on the high seas within the three-mile limit that is under the laws of the United States, but that is also within the territorial waters of the particular state of the Union whose shores they bound); *see also* DORA NEVARES, DERECHO PENAL PUERTORRIQUENO § 4.2.4 (2d ed.1994)(explaining that in cases where a criminal act was perpetrated within Puerto Rico waters but against the laws of the United States, the federal government has jurisdiction).[5]

**C. The waters where the acts charged against Defendants were committed are part of the special criminal maritime jurisdiction of the United States.**

■ The Court has finally reached the critical inquiry of whether the waters where the acts charged against Defendants were committed are part of the special criminal maritime jurisdiction of the United States.

In its Trial Memorandum the Government contends that this Court has criminal maritime jurisdiction insofar as the Defendants' acts were committed upon Jelova Bay, which, they argue, is part of the "special maritime and territorial jurisdiction of the United States." Defendants, on the other hand, argue to the contrary in their memorandum. They allege, *inter alia,* that this Court may not exercise its jurisdiction because Jelova Bay is not part of the United States' special maritime jurisdiction, but that it is part of the exclusive local criminal jurisdiction of Puerto Rico. The Court agrees with the Government.

---

4. The Court further notes that such exception is, in its spirit, similar to the one established by Congress section 6(a) of the Submerged Lands Act. *See supra* note 2.

5. Dora Nevares, J.D., Ph.D., is a renowned scholar and a professor of criminal law at the Interamerican University, School of Law, in San Juan, Puerto Rico.

Jelova Bay is part of the United States' special maritime jurisdiction, under 18 U.S.C. § 7.

The Government charged Defendants with committing an assault within the maritime and territorial jurisdiction of the United States under 18 U.S.C. § 113(a)(4).[6] That section provides in relevant part that a person shall be criminally punished by fine or imprisonment for not more than six months if he is found guilty of committing an "[a]ssault by striking, beating, or wounding," another person "within" "the special maritime and territorial jurisdiction of the United States[.]" *See* § 113(a)(4).

From the outset, it must be noted that § 113(a)(4) does not define what constitutes "the special maritime and territorial jurisdiction of the United States." That special jurisdiction is however defined in 18 U.S.C. § 7, which reads in relevant part:

> The term "special maritime and territorial jurisdiction of the United States", as used in this title, includes:
>
> (1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, **and any vessel belonging in whole or in part to the United States or any citizen thereof,** or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when

such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

Id. (emphasis added).

Few cases have interpreted 18 U.S.C. § 7(1). However, the Court has found some that can be of assistance in interpreting that section. In *United States v. Perez–Herrera*, 610 F.2d 289, 290 note 2 (5th Cir.1980) the Court explained that "section 7 defines the maritime jurisdiction only for purposes of title 18." In *United States v. Keller*, 451 F.Supp. 631 (D.Puerto Rico 1978) defendants were charged with conspiracy, possession with intent to distribute marijuana, and attempt to import marijuana into the United States. After filing motions to suppress and dismiss, the District Court held, inter alia, that where the vessel on which the defendants were apprehended in possession of marijuana was owned **at least in part by a citizen of the United States,** the vessel was subject to the special maritime jurisdiction of the United States. Further, the Court stated that **"the key language in Paragraph (1) [of 18 U.S.C. § 7 is] '... any vessel belonging in whole or in part to ... any citizen ... (of the United States).'"** *Id.,* at 636. Thus, the Court held that if the vessel was owned "totally or partially by any citizen of the United States, the vessel is subject to the operation of 18 U.S.C. § 7(1)." *Id.*

Lastly, as was recognized in *Velez*, 376 F.2d 521, **the general maritime law of**

---

**6.** Although Defendants were also charged with violating 18 U.S.C. § 2, for purposes of the jurisdictional issue raised at this stage, the Court will focus its attention exclusively on 18 U.S.C. § 113(a)(4). Nevertheless, 18 U.S.C. § 2 provides as follows:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**this Nation states that it follows the flag of the vessel.** Therefore, in order to answer whether 18 U.S.C. § 7(1) is applicable in the case at hand, the Court's inquiry should center on whether the vessels in this case **belonged in whole or in part to any citizen of the United States, for that is the key to § 7(1).** *Keller,* 451 F.Supp. at 636.[7]

In the case at bar it is clear that the military vessels (LCU–1676) allegedly assaulted by the Defendants belonged to the United States. See Government Exhibit No. 4.[8] Hence, it is irrelevant to ascertain whether the members of its crew were military or civilians. It is further irrelevant to inquire whether the boat **used by Defendants** was, or was not, owned by any citizen of the United States. It is sufficient to have found in this case that one of the vessels, the LCU–1676, belonged to the United States Navy, under § 7(1). *Keller, supra.*

In light of the above, the Court finds that the acts charged against Defendants were committed in the special maritime jurisdiction of the United States, under 18 U.S.C. § 7(1). Accordingly, this court has jurisdiction to hear this criminal case. The charges against Defendants under 18 U.S.C. §§ 2 & 113(a)(4) shall not be dismissed.

## III

## CONCLUSION

In the instant case, the Court has been referred to no Puerto Rican statute which has supplanted or modified these rules of the United States criminal maritime law. They must, therefore, be regarded as in force in Puerto Rico and, as such, enforceable by the federal Government against its transgressors. Since **Congress has not delegated to the Legislature of Puerto Rico power in the general field of admiralty and maritime law,** it follows then that the criminal maritime laws of the United States are applicable even in Puerto Rico waters. As such, **the general maritime law of this Nation states that it follows the flag of the vessel.** Accordingly, the Court finds that the Commonwealth of Puerto Rico and the United States share concurrent criminal jurisdiction over the local waters of Puerto Rico.

To hold the contrary would lead this Court to a ridiculous situation. It would mean the United States has no criminal jurisdiction for crimes committed against its laws in the maritime waters belonging to Puerto Rico under § 749. The Court has found no case nor any intent in Congress when it enacted § 749 to create a jurisdictional heaven in Puerto Rico waters for the commission of traditional federal

---

**7.** In *United States v. Arra,* 630 F.2d 836, 840 (1st Cir.1980) the Court recognized the customary principle that "[t]hrough registration a vessel acquires its nationality." In other words, for purposes of criminal jurisdiction, "a vessel is deemed to be part of the territory of the sovereign whose flag it flies." *United States v. Winter,* 509 F.2d 975, 983 note 2 (5th Cir.1975).

**8.** "The term 'vessel of the United States', as used in this title, means a vessel belonging in whole or in part to the United States, or any citizen thereof, or any corporation created by

or under the laws of the United States, or of any State, Territory, District, or possession thereof." 18 U.S.C. § 9. Furthermore, the First Circuit has set a liberal rule for determining what constitutes a vessel under § 9, explaining that to render a vessel American, so as to punish offenses on board of her, it is enough to show that she sailed from and to an American port, and was apparently owned and controlled by citizens of the United States. *United States v. Peterson,* 27 F.Cas. 515, 1 Woodb. & M. 305, No. 1637 (Mass. 1846).

crimes—that is, *e.g.*, to create an insulated maritime "red zone" for the commission of drug transactions, among many other crimes. Surely that result is unsupported by law.[9] Thus, the Court finds that it has jurisdiction to hear this case, for the acts charged against Defendants were committed in the special maritime jurisdiction of the United States.[10]

**WHEREFORE,** the Court hereby **DE-NIES** Defendants' Memorandum (Docket No. 73) and preserves its jurisdiction in this case. The motion for acquittal based on reasonable doubt is reserved.

**IT IS SO ORDERED.**

---

9. For example, it would mean that the United States would maintain jurisdiction for crimes committed "[a]ny place outside the jurisdiction of any nation with respect to an offense by or against a national of the United States," (18 U.S.C. § 7(7)) while at the same time, it would be prohibited to prosecute crimes committed even a few yards from the land and beaches of Puerto Rico and adjacent islands, such as those where the alleged acts occurred here. Such result would be absurd.

10. In sum, notwithstanding the recognition to the coastal states of their domain over their territorial waters (through the Submerged Lands Act, *supra*), and particularly the recognition that Texas and Florida were entitled not to three land miles, but to three **marine leagues,** in accordance with the ancient Spanish maritime custom (*United States v. Louisiana, supra*); and notwithstanding the eventual amendment to 48 U.S.C. § 749, equating Puerto Rico's domain over its local waters to that of Texas and Florida, **Congress has always reserved to the United States the broad authority it has had traditionally in the General Admiralty and Maritime jurisdiction of this Nation,** both civil an criminal. *See* section 6(a) of the Submerged Lands Act, supra, note 2 (Congress reserving to the U.S. its navigational rights and powers over **all** navigational waters); 48 U.S.C. § 749 (Congress reserving to the U.S. its navigational rights and powers over **all** navigational waters, including those in Puerto Rico); *see also Velez,* 376 F.2d 521 (notwithstanding Puerto Rico's powers in maritime jurisdiction, Congress has never delegated to the Legislature of Puerto Rico power in the general field of admiralty and maritime law). Thus, Congress has never relinquished that power to the states or Territories.